Mulock *v.* Mulock.

MARIA MULOCK

*v.*

WILLIAM G. MULOCK.

1. A deed of gift will always be set aside in equity, even in a case free from actual fraud, whenever it is clearly shown that the deed does not, in a material respect, conform to the intention of the grantor, or that he executed it under a total misapprehension as to its effect.

2. A son who occupies towards his mother a position of trust and confidence, is bound, if his mother desires to make a deed of gift to him for a large part of her estate, to see that the deed, in all substantial particulars, conforms to her intention, and that she fully understands its nature and effect; otherwise the deed will be set aside.

3. A court of equity never lends its aid, at the instance of the donee, to reform a voluntary deed.

Mulock *v.* Mulock.

On final hearing before the vice-chancellor, on bill and answer and proofs taken orally.

*Mr. Joseph Coult* and *Thomas N. McCarter*, for complainant.

*Mr. John Whitehead*, and *Mr. David R. Garniss*, of New York, for defendant.

THE VICE-CHANCELLOR.

This is a suit by a mother against her son, to avoid three deeds made by the former to the latter. Two of them were executed on the 19th day of October, 1871, and the other April 6th, 1872. Together they transferred real estate, situate in the city of Newark, worth, at the time they were made, nearly $150,000. They were purely voluntary, being, as the defendant claims, deeds of gift. The property thus conveyed, together with two gifts alleged to have been subsequently made to the son, constituted more than one-half of the mother's whole fortune. At the date of the deeds, she was about seventy-five years old, and the son thirty-one. She had eight other children. The relations between the mother and the son were of the most confidential character. His influence over her was very great. He admits that she reposed great confidence in him, and relied implicitly on whatever he said; that he had full command of all her business; that whenever she wanted to know anything about her affairs, she applied to him. He received all her moneys, and controlled their disbursement, and attended to the preparation and execution of all the papers which it was necessary for her to execute in the management of her business. In the management of her estate, he was, to a very great extent, the mind and will that controlled it, and she, simply the hand by which he wrought his purposes.

On the defendant's own showing, it is obvious his position was one of high trust and confidence, where he was bound, both by honor and law, not only to abstain from

Mulock v. Mulock.

everything like craft and guile, but to be generously just and fair; to cast behind him even a wish to use his mother's trust in him as a means of personal advantage or selfish profit.

The bill presents a bad case of fraud. It alleges that the complainant was induced to execute the two deeds first in date, under a belief that they were releases. She held a mortgage upon certain lands situate in East Newark, which had been divided into building lots and mapped, and she had been in the habit, whenever a lot was sold, of releasing it from the lien of her mortgage. Five or six such releases had been executed prior to the date of the deeds. She says that when she executed the two deeds now under consideration, she supposed they were releases, releasing the lien of her mortgage from lots which the mortgagor had sold.

The defendant says all the gifts to him were made in execution of a purpose long cherished by his mother, and which originated in a desire expressed by his father that, in the distribution of the property he gave her by his will, a larger share should be allotted to him than to the other children. He also says that the two deeds first executed were prepared after she had repeatedly directed him to have them prepared, and that he read them to her in the presence of a person who, in consequence of his participation in the transaction, and close identification with the defendant in the whole of this business, would undoubtedly have corroborated the defendant's evidence on this point, if he could. But he swears the deeds were not read. He says, that just before the complainant, the defendant and he went together to the office of the notary before whom the deeds were executed, the defendant came into the room where the complainant and he were, and said: " Ma, I have got those deeds from Newark; if you will go and sign them, Mr. Riker can take them and have them recorded. I did not hear any reading of the deeds at all." He also says that they went to the office of the notary; that the notary asked the complainant if she understood what she

was signing, and they talked some, and then she signed the papers, after which they were put up and handed to him, and he brought them to Newark.

Just here it is important to state that this witness, when speaking of the third deed, which he said he had prepared at the complainant's request, said : "When this last deed was executed, nothing was said about a release; the complainant knew—it could not be otherwise but what she knew—that she was signing a deed, but the others I have got nothing to say about." When we consider the position and relations of this witness, his part in the transaction, and his opportunities of knowledge; that he had the two deeds first in date prepared at the request of the defendant, and took them from Newark to the residence of the complainant in New York, and there delivered them to the defendant, and not to the complainant; that he remained over night in the house of the complainant; and had a conversation with her, alone, next morning, but made no allusion to the munificent act she was about performing towards her son; and, although he was then her agent to collect the rents of the properties he knew she was about to convey, he evinced no curiosity to know from her what were to be his relations in the future, in respect to them, towards her; that, although he knew she had divested herself of all title, but did not know that it was understood that the rents should be reserved to her, he continued, up to the time the deeds were repudiated as fraudulent, to treat her as the owner of the properties, collecting the rents in her name, taking out insurance in her name, and making repairs in her name; that, at almost all the important transactions brought under review in this case, he seems, most fortunately for the defendant, to have been present, but how or why it happened so he cannot very satisfactorily explain; and that when the mother's denunciation of the son's conduct constrained him to leave her house, he took up his abode with this man—his statement, just quoted, amounts to something more than a simple confession of ignorance. I regard

it as absolutely certain that, if these deeds are the product of fraud, that this person actively and consciously assisted in its perpetration.

The deed of April 6th, 1872, embraced two lots—No. 587 Broad street, and No. 27 Cross street. The complainant admits that, under a representation by Riker that the title to lot 587 Broad street was defective, and would probably be the subject of litigation, and, on his advice, she consented to convey it to the defendant, and directed a deed to be prepared accordingly. She says a deed was afterwards presented to her for execution, and she signed and acknowledged it without its being read to her, under the belief that it simply conveyed the lot she had directed to be inserted. Riker, on the contrary, says that she directed both lots to be included, and both he and the defendant swear that the deed was read. The defendant says it was read to her before they went to the notary's office, and Riker says it was read to her by the notary, at his request, after they got there. The notary has not been examined. Some time after the execution of this deed, he removed from New York City to the state of Missouri. The defendant, though aware of his place of residence, has not deemed it advisable or necessary to make the requisite effort to get his evidence.

If we accept the evidence on the part of the defence as entirely accurate, still it is not at all certain that the complainant executed the deed fully understanding what it embraced. It is not pretended that any explanation was made by which the complainant was told, simply and plainly, that the deed embraced the two lots. All that is claimed is that the whole deed was read. If this work was performed by the notary, it is very probable the reading was so rapid and indistinct as to be in a great measure unintelligible. Any reading to an unprofessional person, or a person not familiar with the terms used in describing lands, unaccompanied by an explanation expressed in simple language, would be quite as likely to mislead or confuse as to

Mulock v. Mulock.

enlighten. But let me say, in addition, I think there is great reason to doubt the truthfulness of a story which, in effect, says that this old lady quietly submitted to the infliction of having this long paper read to her, the most of which was mere jargon to her, without the slightest expression of impatience or any inquiry as to its necessity or use. What was the reason for this purely ceremonial caution? She had directed the preparation of the deed; she was surrounded by persons in whose integrity she had the utmost confidence; she was not consummating a bargain where her interest and self-protection demanded she should be watchful and cautious; her trusty son was at her side, and the act she was about to perform was the bestowal of a gift upon him; under such circumstances, it seems to me, anything like a mere ceremonial caution, directed entirely by another, would have been promptly resented, not only as a useless infliction, but an impertinent interference.

I am compelled, moreover, to say that neither the demeanor of these witnesses while giving evidence, nor their evidence itself, inspired my confidence. Their evidence bears marks which furnish cause for serious distrust; it is marked by evasion, an unnatural forgetfulness and an affected ignorance and dullness. No one can read the testimony of either without observing that, while their recollection is full and fresh on every point which an unprofessional mind would deem indispensable to the establishment of the fact that the deeds were legally executed, they have no recollection whatever of those minor circumstances and details naturally and almost unavoidably forming a part of such a transaction, and which usually fasten themselves upon the memory more firmly than its more important features. Nor do I think any one can fail to see that the circumstances attending these very important transactions, as they describe them, are unnatural and improbable. Why, the bestowal of these princely gifts excited no more wonder in the mind of Riker, nor gratitude in the heart of the son, than if the mother had passed over to the son a ten-dollar bank

Mulock *v.* Mulock.

note. The deeds are produced and executed without a word being uttered by either as to the unusual character of the transaction; nor is it said the mother spoke a single word in justification or explanation of her act, though by it she was bestowing upon one of her children nearly as much as she could give the other eight altogether. Nor does it appear that she accompanied the gift with the slightest admonition as to prudence, or the least expression of a hope that the son would remain faithful to his filial obligations. Usually, some remark of that nature would be the natural, and almost inevitable, accompaniment of such an act.

But it is insisted that an admission by the complainant, made in August, 1872, has been proved, which conclusively demonstrates that the deeds were her conscious, deliberate and voluntary acts. The admission is proved by two persons, a husband and wife. It is said it was made to the wife first, and immediately afterwards repeated to the husband, in the presence of the wife. The husband says, the complainant said that she had transferred or deeded all her property in Newark to the defendant, and also a brown stone house in the city of New York, but he was not to have full control of it until after her death; the property was to be repaired out of the rents, the defendant was also to have enough of them to pay his personal expenses, and the balance was to be paid over to her as long as she lived. She also said that the property she had thus disposed of did not embrace her whole estate; she had considerable left, and on her death that was to be equally divided among the defendant and her other children. The wife's recollection differs so widely from that of her husband, in almost every material point, that, in the absence of cogent proof to the contrary, it would be very difficult to believe that they were attempting to reproduce the same conversation. She says the complainant told her, when they were alone, that the defendant should have all her property; it had belonged to his father; she had given her daughters all she intended to give them, and the defendant should have the remainder;

she did not specify the property, but said he was to take all the balance. She further says that her husband came up just at this point in the conversation, and that the complainant repeated to him what she had just before said to her. She heard both the original statement and its repetition.

It is needless to remark that the discrepancy between these two narratives is fundamental and irreconcilable—the one speaks of a purpose fully executed, embracing part only of the complainant's estate, the other of a purpose resolved upon but unexecuted, embracing the whole of her estate. Both witnesses are doubtless honest, but the question is, Which is right? Fortunately, the proper determination of this case does not turn upon the solution of that question.

Even if we look at the deeds brought in judgment solely from the defendant's standpoint, and take his story of their origin and history, as giving the whole truth, still, in my judgment, it is the duty of the court to declare them invalid. They are absolute in terms, giving the defendant not only a full estate in the lands conveyed, but a perfect and absolute right of present enjoyment. In this respect, it is admitted, the deeds do not conform to the intention of the grantor, nor to the understanding of the grantee. The defendant swears that his mother said she would give him the properties, but would keep the rents, and that he said, very well. He also says, she said so at the time the deeds were made, and that that has always been the understanding between them.

The complainant's act, in making the gifts, was an act of pure grace; she was at liberty to impose such conditions as she saw fit, and the defendant was bound, both in law and honor, to see that what she intended to reserve was secured to her as fully and as perfectly as that which she intended to give was granted to him. He was bound to do something more than practice the utmost good faith; his position made it his duty to see that the instruments to be executed by his mother were sufficient, legally, to carry her whole scheme or purpose into effect—not simply a part—

Mulock v. Mulock.

and, also, that she fully understood their nature, effect and consequences. A failure in any one of these important duties was a fraud.

The legal principles to be applied in testing the validity of these deeds, I think I am bound to consider settled in this court. A deed of gift will always be declared invalid by a court of equity, even in a case unsmirched by fraud, whenever it is clearly proved that the deed does not, in a material respect, conform to the intention of the grantor, or that he executed it under a total misapprehension as to its effect. *Garnsey* v. *Mundy, 9 C. E. Gr. 243; Story's Eq. Jur.* § *706b.* According to the judgment of Lord Eldon, in a case so familiar that I need not name it, the question is not, did the grantor execute the deed voluntarily, but, with full knowledge of the nature, effect and consequences which the law gives it. To be upheld, it must be the pure, voluntary and well-understood act of the grantor's mind. Said Vice-Chancellor Stuart, in *Anderson* v. *Elsworth, 7 Jur. (N. S.) 1052, 3 Giff. 154:* " This court never can recognize any deed which is a mere voluntary deed of gift, when it appears that there was any defect in the understanding of the nature of the gift on the part of the donor ; if the deed be tainted with a want of complete understanding of its nature by its author, the court must treat it as invalid, and consider that the property did not pass." The same principle has been stated and applied in *Houghton* v. *Houghton, 15 Beav. 278; Toker* v. *Toker, 31 Beav. 644; Phillipson* v. *Kerry, 32 Beav. 628; Lister* v. *Hodgson, L. R. (4 Eq. Cas.) 30; Coutts* v. *Acworth, L. R. (8 Eq. Cas.) 558; Wallaston* v. *Tribe, L. R. (9 Eq. Cas.) 44.* The wisdom and justice of this principle are obvious to every mind. Its application to this case is conspicuously pertinent, and its effect most righteous.

The deeds cannot be reformed. A court of equity never lends its assistance to enforce the specific performance of a voluntary contract, where no consideration emanates from the party asking performance. *Fry on Spec. Perf. 71;*

Mulock *v.* Mulock.

*Groves* v. *Groves, 3 You. & Jer. 163; Story's Eq. Jur.*
§ *787.* In *Lister* v. *Hodgson, ubi supra,* Lord Romilly,
master of the rolls, said : "What I consider to be set-
tled by the cases is this, that if a voluntary deed is
incomplete, this court will not compel the completion
of an imperfect instrument; the court will never inter-
fere to enforce a contract for the due execution of a vol-
untary deed." And in *Turner* v. *Collins, L. R. (7 Ch.
App.) 342,* Lord Hatherly said : "It has always been said,
and truly, that there is great difficulty in reforming a vol-
untary deed, because, if any part of it is shown to be ·con-
trary to the intention of the parties, you can only deal with
it by setting the whole aside." Like views were expressed
in *Phillipson* v. *Kerry, ubi supra,* and *Brown* v. *Kennedy, 9
Jur. (N. S.) 1166, 33 Beav. 133.*

All three of the deeds must be adjudged invalid as to all
the lands described in them. No distinction can be made
in favor of the lot No. 587 Broad street. If the defendant's
evidence is believed, he, either designedly or negligently,
permitted his mother to convey that lot to him by a deed
which, by its terms, gave him, as he knew or ought to have
known, a great deal more than she intended. And if the
evidence on the part of the complainant is believed, it is
shown to be so thoroughly infected with fraud, as to one
lot, that no part of it can be allowed to stand. Under
neither view can any part of that deed be held to be valid.
After a very careful and patient examination of this case, I
am compelled to say the conviction left upon my mind by
the evidence is, that the defendant has been guilty of some-
thing worse than a mere legal fraud.

The complainant is entitled to a decree, with costs.