EDWIN W. THORP

v.

ISABELLE THORP SMITH and her husband.

[Submitted November 9th, 1901.   Decided March 8th, 1902.
Filed April 23d, 1902.]

A father, who was advanced in years and feeble in health, with his mental powers weakened, executed, shortly before his death, a mortgage on his home to his daughter in consideration of her services to him, without any independent advice as to the effect of the instrument. Previously the daughter had married, bringing her husband to reside in the home, whereupon her brother, who had resided with her and the father, left. The brother and his father had erected the home, devoting to it the earnings of their business, of which the former was the principal factor, and he had also contributed to it his savings from other sources. The brother claimed the home was constructed with the understanding that on the father's death it was to belong jointly to him and his sister. The sister had notice of such arrangement, and such claim had support in the conduct of the business and contemporaneous declarations of the father.— *Held,* sufficient to warrant a decree setting aside the mortgage as void, with direction for partition of the premises.

On final hearing on bill, answer and proofs.

*Mr. James A. Gordon,* for the complainant.

*Mr. Joseph Anderson* and *Mr. Robert L. Flemming,* for the defendants.

PITNEY, V. C.

The complainant, Edwin W. Thorp, and the defendant, Mrs. Smith, are brother and sister and sole heirs-at-law of Ezekiel Thorp, late of Jersey City, who died on January 17th, 1900, intestate, and seized of a house and lot situate on the corner of Pavonia avenue and Homestead Place, near the five corners and the court house, on Jersey City Heights. He was past sixty-seven years old when he died, and on December 18th, 1899,

one month before his death, he executed a mortgage upon the premises to the defendant, Mrs. Smith, to secure the sum of $3,000 in one year, with interest payable semi-annually and also certain other sums of money which will be hereafter more fully stated.

The object of the bill is to have this mortgage declared void as against the complainant, and for a partition of the premises.

The grounds stated in the bill upon which the complainant bases his right to relief as against the mortgage are that at the time it was executed his father was enfeebled by disease and age, both in his body and his mind, and was, and for some time had been, subjected to the exclusive influence of his daughter; that the mortgage was without consideration and was the result both of improper influence on her part and a clear misapprehension of the true situation of his affairs and his family relations and of his duty to both his children.

The bill calls for an answer as to the consideration of the mortgage, and the defendants in their answer set it out as follows: "Services and attendance rendered and given by Isabelle Thorp Smith to Ezekiel Thorp in his lifetime," and

"money lent by Isabelle Thorp Smith to Ezekiel Thorp, and moneys received by Ezekiel Thorp to the use of Isabelle Thorp Smith, and money paid by Isabelle Thorp Smith to the use of Ezekiel Thorp, and love and affection existing between Ezekiel Thorp and Isabelle Thorp Smith."

No consideration in money passed at the time of the execution of the mortgage, or at any other time, from the mortgagee to the mortgagor. The defendants attempted to sustain it on the ground that the mortgagor, at the time of its execution, was in complete possession of his faculties and under no improper influences on the part of his daughter or her husband, and that he thoroughly understood and appreciated what he was doing, together with the result, and that the true consideration was in part for services which his daughter had already rendered and a feeling of gratitude to her for her kindness to him.

In addition to the grounds set out in the bill, the complainant advanced another ground at the hearing, and was permitted to adduce proof in support of it, the defendant being given

ample opportunity to answer it. That ground, briefly stated, was that, at the time the lot upon which the house stands was purchased by the father and the house erected thereon, a parol contract was entered into between the father and son by which it was agreed that their joint earnings should be invested in paying for the property, and that it should, at the death of the father, belong to the son and daughter jointly, and that the son, relying upon that parol contract, did render services and earn moneys which were taken by the father and used in paying for the property.

In order to properly understand the situation of affairs at the date of the mortgage, it is necessary to go back many years and give the history of the family from the childhood of the complainant and defendant.

The father was a mason, bricklayer and plasterer by trade, and somewhere before the year 1860 married a Miss Robinson, belonging to a family of that name who lived very near the premises in question, who bore him the two children, parties hereto, the complainant being born in the year 1860, and his sister, the defendant, in 1867. It was shown in the proofs that the wife of the deceased was, early in her married life, afflicted with insanity, and for many years, and up to her death, which occurred in 1895, lived in a sanitarium, which, however, seems to have involved no great expense to her husband.

For about twenty years prior to the year 1886 the father lived with his wife's family, the Robinsons, and his daughter also, during the whole of that period. When the complainant was old enough to work out he obtained various jobs in New York City, where his paternal grandparents lived, and earned his own living.

The daughter attended the public school and, according to her account, was supported by her mother's family, with the exception of her clothing, the materials of which were furnished by her father, who also gave her some spending money.

Somewhere about 1882 or 1883 the son, having lived away from home for five or six years and attained his majority, went to work for his father at the mason trade, receiving small wages and boarding himself, and by the year 1885 or 1886 was a

journeyman mason, able to do journeyman's work and earn journeyman's wages. Up to 1886, however, he had received from his father only small wages—he says $6 a week—out of which he supported himself, and entries in the books of account in his father's handwriting sustain his statement. He always has been a sober, industrious, hard-working and saving man, with no expensive habits, and, according to his sister, decidedly stingy.

Up to the last time mentioned—1885-1886—his father had acquired little or no property. He was a rather jolly, good-natured man, without much business capacity or thrift, and, according to a large number of witnesses who knew him well and whose evidence was given in such a manner as to command belief, he was of an easy, yielding nature, easily persuaded, and generally agreed on any subject with the last man who sought to convince him.

He pursued his calling as a mason, bricklayer and plasterer by doing small jobs of repairing and additions, by the day, and occasionally doing mason work by contract on small houses.

He had neither capital nor talent to undertake large transactions, but at the same time he was a man who made friends and was generally esteemed.

This being the situation, in the early part of the year 1886 a Mr. Heritage, who was his friend, and for whom he and his son were working, suggested to him that he should buy a lot and build a home for himself, referring to his son having grown up and now working with him and his daughter becoming a young lady, and when, in answer to this suggestion, the deceased spoke of his want of money, Heritage agreed to assist him by loaning him money without security for the purpose of buying a lot and also to negotiate for the purchase of a lot for him. The result was that he was able to scrape together $450 in cash, which, added to $650 loaned to him by Heritage on his note, enabled him to buy the lot here in question at the price of $1,100, without giving a mortgage. His son, the complainant, had already taken four shares in a building and loan association in the neighborhood in which his father was a director or manager, and he thereupon assigned those shares to his father,

and upon them the father procured a loan from the association for $800. With that money a building was commenced and subsequenty $2,400 in addition was borrowed from the same source and a mortgage given therefor, twelve additional shares, of $200 each, in the association being taken in the name of the father. The house was then erected, the father and son working in its construction, the total cash expended in its erection being $3,200, besides the joint labors of the father and son. This made the cost of the house and lot $4,300 over and above the value of the labor of the father and son which entered into its construction. It was then fairly worth $4,500, and that is the value now put upon it.

The son swears that when his father undertook to build the house they made an agreement, wholly by parol, stated by the son as follows:

"We entered into a contract there that I would work for my father, and he would work, and we would both work together, and put every dollar that we could into that house outside of the support and living of ourselves, and pay for that property, and that if anything should happen, that he should die before I did, it would revert to my sister and myself. That was the contract entered into."

The house was finished in the fall of 1886, and the father and son took possession and set up housekeeping, the daughter being the housekeeper, and the father and son living with her. The house contained three floors, with three rooms on each floor, called, respectively, parlor, dining-room and kitchen. They rented out one floor for $16 a month. That rent was paid—certainly after a year or two—to the daughter. She used it for beautifying the interior of the house and furnishing it, for her own clothing and pocket money, and for the hire of a cheap servant to assist her in housekeeping.

From the time of setting up housekeeping they all lived together and the expenses of the housekeeping, table, &c., were all paid out of the joint earnings of the father and son.

About the same time the father and son entered into a partnership, under the firm name of E. Thorp & Son. The father already had a bank account in his individual name in the Hudson County Savings Bank, which was an institution of a dual char-

acter, one part being devoted to pure savings bank business and the other part to the ordinary business of keeping active accounts and discounting paper. That account was continued, without change, in the name of the father, and all the funds of the partnership that were deposited in any bank were deposited to that account. The nature of the business was, as before, small jobbing and repairing by the day and small contracts, employing usually one journeyman, besides the father and son, and occasionally one or two extra journeymen, with the ordinary force of laborers, making four, five or six hands, including the partners.

About five years previously the father had joined a local association of the Royal Arcanum, in which he insured his life for the benefit of his son and daughter, respectively, for $1,500 each, separate certificates being made out to each. Upon those certificates monthly or quarterly dues had to be paid. In addition to these payments the interest and dues to the building and loan association, which held the two mortgages for $3,200, and the interest on the note to Mr. Heritage had to be paid. This was done promptly and all out of the joint earnings. The payments consisted, as usual in such cases, first, of the interest of six per cent. on the whole face of the loan, and second, dues on the shares in the association, at the same rate, making twelve per cent. monthly on the whole face of the mortgage until the accumulated earnings should extinguish them.

The first mortgage of $800 was canceled as paid October 30th, 1893; the second mortgage of $2,400 was canceled as paid on July 2d, 1896, all, as we have seen, as the result of monthly payments at the rate of twelve per cent. a year.

A third mortgage to Mr. Heritage for $643, being the balance due him on the original loan, was given on the premises June 2d, 1889, and canceled as paid January 31st, 1895. A new mortgage was given to the building loan association for $1,000 on January 9th, 1895. That loan was based on five shares of stock in the institution, and by the working of the system it was gradually paid off from the same source, and at the time of the deceased's death only about one-half of it remained due; and the monthly dues on the shares were paid up in advance

for several months after he died, leaving to be paid only $5 a month.

The result was that between the year 1886 and the year 1899 the deceased had paid upwards of $3,500 toward the cost of his house and lot, and had paid his dues regularly upon the life insurance. And it may as well be stated here that after his death the complainant and his sister each received $1,500 in cash from the Royal Arcanum.

To go back to the fall of the year 1886. The proof is entirely clear and satisfactory, as given by several disinterested, sensible and reliable men, who were well acquainted with both the father and son and their circumstances, that the prosperity of the old gentleman during this period was due mostly to the industry, energy and hard work of his son, the complainant, done by his own hand as a mechanic. Express declarations made by the father, in which he recognized the efficiency of the son and the value of his services and the happy result as shown in the house and lot were proven. This efficiency of the son forms the natural explanation of the change in the prosperity of the father's affairs, which occurred at or about the year 1885. Previous to that, as we have seen, he barely made a living. After his son worked for and with him and entered into business with him he saved money every year.

Further, the evidence shows that substantially all the surplus earnings of the two and the profits, in themselves quite small, derived from their business, were devoted—first, to their living expenses; second, to monthly installments on the mortgage on the house and lot, and third, to keeping up the life insurance.

The son testifies that at his father's death he had little or nothing of his own, and there is no evidence to contradict him.

Between the years 1892 and 1896 the father became disabled by a series of afflictions; first, by a severe attack of rheumatism and next by several strokes of paralysis, suffered at considerable intervals of time and of varying severity. The attack of rheumatism entirely disabled him for a considerable period of time. One of the strokes of paralysis laid him up for several days, others for only a short period. Each was attended with the usual symptoms of contortions of the face and numbness in the

right side, which finally resulted in a permanent lameness. He was unable to raise his right hand; was obliged to walk with a cane. He became obese, and was so stiff that he could not make the requisite motions of the body to enable him to work at his trade. He did work somewhat, but all who saw him unite in saying that towards the last it was mere child's play; and he was unable, as he himself declared, in the latter years of his life, to assist his son even in estimating for him the cost on his bids on small contracts; and the proof is clear that when called upon about any business he referred everybody to his son, the complainant, and attempted to do little or nothing himself.

·This failure of body was accompanied by weakening of the mental powers, and both were, naturally enough, progressive.

In the years 1896 and 1897, when he was partially incapacitated in the manner stated, he sought and obtained the position of inspector of municipal street work which was being done near his house, and he bestowed upon it about the amount of labor and attention which is expected of such officers, and he received in all for it about $225, which he put to his own account in a savings bank and used for his own purposes.

The business of the firm of E. Thorp & Son was continued for the last six or eight years of his father's life entirely by the son. The evidence is that all deposits in the bank, and all drafts therefrom, were made by the son, who signed the name of "E. Thorp" to checks and they were honored by the cashier, who swears that the bank recognized the fact that the father was a paralytic.

The evidence is also quite clear, as given by numerous witnesses who were thoroughly acquainted with him, that for the last year of his life, and particularly toward the latter part of that year, the father became decidedly deficient in his mental powers; from being cheerful and jolly he became melancholy, when talked to by his old friends would cry and say he good for nothing and wished he were dead. His memory failed; he repeated, within a few minutes, the same question several times, and he was unable to keep up a continuous, coherent, intelligent conversation. There was some evidence to the contrary of this, but the great weight of the evidence, given

by numerous disinterested persons, who, as I say, were well acquainted with him, and whose evidence struck me as reliable, is to the effect just stated. As an example I will state that one of the witnesses swears that on one occasion he called upon the father at his house and gave to him in person an order for the son to do a small but pressing job of repairs, and the father promised to send the son to attend to it but did not, and the next day had entirely forgotten that the order had been given.

For some time before the month of October, 1899, the daughter had been engaged to be married to the defendant, Smith, and finally decided, with the consent of her father, to marry him, and the plan she proposed was for her and her husband to come home and live with their father in the house. In anticipation of that change the tenant, who had all the time occupied the middle floor of the house at a remunerative rent, was ejected, and the father was placed in more comfortable quarters and room was made for the husband and wife. The father and son and daughter had previously occupied the third floor of the house for sleeping purposes; but on several occasions when the father was unwell he had occupied the dining-room on the first floor for two or three months at a time. When it came to settling the terms upon which they should all live together, the complainant's idea was that his sister and her husband should keep house and that he should board with them. They desired him to pay one-half of the whole expense of the house. He seemed to feel that this was not quite fair, and expressed dissatisfaction with it. He did not attend the wedding. He says he was not notified at what place it was to be celebrated. The sister says that he manifested no desire to attend. The bride and groom took a short bridal tour and returned home late at night. The brother did not see them until the next evening at supper. (In his testimony he speaks as though he understood that they had arrived home that day.) And when came to sit down to the supper table he felt that he was treated courteously by his sister and her husband, and determined to make his home elsewhere. It is plain that he felt that the acquisition of the house and lot was mainly due to his labors, and that, in equity, he was the owner of a large interest therein

Thorp v. Smith.

(and he swears that he so declared to his sister), and that his sister was not treating him as she ought to. The sister denies that he made any claim to any equitable ownership in the house. The result was that he left the house about November 5th, 1899, a week after his sister was married, and did not return there until he was sent for shortly before his father died. He says he saw his father sitting in the window, which was his favorite place of sitting, and that he kept himself posted as to his condition by indirect inquiries. He says that the feeling against him by his sister and her husband was so strong that he was satisfied that they would not permit him to enter the house if he had asked for admission, and he abstained from asking.

A respectable and intelligent man of business and a scrivener, Mr. John Wright, who lived and had an office in the neighborhood and was well acquainted with the parties, swears that in the latter part of the summer or early in the fall of 1899 he met the father hobbling along with a cane on the street and had a short conversation with him and discovered that his talk was so disconnected and incoherent that he looked at him to see whether he was losing his mind, and testifies that the impression made on his mind just from that short conversation was that the old gentleman was indeed losing his mind. Some time in the latter part of November or December—Mr. Wright cannot fix the date, but it is fixed by the daughter in her evidence—and when the old gentleman was entirely confined to the house, the defendant, Mrs. Smith, called on him, Wright, or, rather, met him in the street, and told him, as he swears, that her father wished him to come down to the house to draw a deed of the property from her father to her; and they both agree that he promised or intimated that he would come, but was unable to go at that time, and he did not go. Later on, and, as circumstances show, late in December, he swears that she called on him again and asked him why he had not been down to draw that deed, and requested him to come; and he swears—

"I told her—I said to her—what is the use of having that deed drawn; that will never stand; that is an injustice the courts will never sanction. However, I will go down."

But he did not go. He explained that he based his opinion of the injustice of the thing upon what he knew from his own observation of the amount that Edward had contributed toward the cost of the house and lot, and from what the old gentleman had previously told him—always speaking of Edward being a good son and an industrious and hard-working man. The daughter admits that her father requested her to ask Mr. Wright to come to the house and that she called on him once for that purpose. She denies that she told Mr. Wright that her father wanted a deed prepared to her, and she denies positively the second interview. I am entirely satisfied that Mr. Wright's statement is true. He was entirely disinterested and his manner and surroundings were not those of a man who would either imagine a thing that had never occurred or would invent it out of the solid. The denial by the defendant of this interview must seriously affect the value of her evidence on other subjects, and the fact of the interview has, as I think, an important bearing on what followed.

The date of this interview with Wright, as I have said, is fixed by Mrs. Smith and her aunt, Miss Robinson, who was living with her, as being late in the month of December. They swear that the father was vexed at the complainant for leaving the house and that he said the complainant was unwilling that the tenant should be given up and the rent lost, even in order to enable the father to have a comfortable place to sleep, and that he would never forgive him (the son swears that his desire was that his father should have one of the rooms on the first floor for a bedroom, but that his sister opposed it because it would render their mode of living less stylish) ; that he expressed to Mrs. Smith and to Miss Robinson the fear that when he, the father, died the son would get all the daughter's money away from her, and also that he said that "Ed." had more money than they knew of, and that, besides, he had the benefit of the business. Further, the daughter swears that her father said to her that if he should die she would have nothing but the life insurance money. It was in connection with this talk, or series of talks, with the old gentleman that, as Mrs. Smith swears, he requested the daughter to bring Mr. Wright, but both

the daughter and Miss Robinson swear that he said nothing about a deed. Then, after waiting some time for Wright, the daughter and her aunt both swear that the father became alarmed and worried about the monthly dues of interest, amounting to only $5, on the building and loan mortgage; that he said that if it was not paid promptly a foreclosure would result, and that he thought that Mrs. Smith's husband ought not to pay it; that, giving up hope that Wright would call to see him, her father sent Mrs. Smith to Mr. Nelson, the secretary of the building and loan association, to inquire what could be done about the interest on the mortgage. Nobody appears to have thought it worth while to ask the complainant to pay it, or that it was improbable that the building loan association would harshly enforce against one of its old managers so small and so well secured a mortgage, or to suggest that $5 a month was a very small sum for Mr. Smith to pay as rent for a house which was worth at least $30 a month. Mrs. Smith called on Mr. Nelson on the subject, and she swears that he told her that whatever was paid for that purpose could be secured to the person paying it by a mortgage to be executed by the old gentleman; that she reported his answer to her father and that her father directed her to get a lawyer to come and see him; and they swear he said that he wanted some one that would do as he told him to. The language of the witness is: "He says you go and get me a lawyer. He says get me a man that has a legal right to do as I want him to do." I can see no occasion for using such language, if he did use it, unless the daughter had told him what Mr. Wright had said to her.

I think from all the circumstances that I am justified in inferring that the daughter was deterred from a project which she had entertained of procuring an absolute conveyance from her father by Mr. Wright's chilling declaration as to the injustice of the thing, and that she took up with readiness the idea of a mortgage given for an actual consideration in the shape of moneys paid to keep down the payments on the existing mortgage. She swears that her father told her to go and get a lawyer to draw this mortgage; that he did not in the first place tell

her for what amount it should be given; that she went to Mr. Anderson, her present solicitor, to employ him to draw the mortgage and that she returned to her father and obtained his direction that it should be for $3,000.

Now · here was presented an opportunity for her to impose upon her father in procuring him to execute a mortgage for a greater sum than he really supposed he was giving.

It appears by the evidence that Mr. Thorp, as well as his daughter, was thoroughly acquainted about the court house and five corners, and knew that there were plenty of lawyers having offices there, and in particular Mr. Thorp was well acquainted with Mr. Gordon, the now counsel for the complainant herein, and at one time—as I infer in the summer of 1899—spoke of employing him to do some business.

About the 10th of January, 1900, Mrs. Smith called on Mr. Anderson, who had his office a mile or two away from Jersey City Heights, and who had no acquaintance with Mr. Thorp; the only acquaintance Mr. Anderson had with the family arose out of his having attended the public school with Miss Thorp. As we have seen, she told Mr. Anderson that her father wished to make a mortgage to her. Mr. Anderson asked her for how much; she said she did not know; he sent her back to her father to ascertain the amount, and Mrs. Smith returned and stated it to be $3,000.

In her account of her interview with Mr. Anderson she does not state that she stated to him that the mortgage was intended also to secure any money that she might be obliged to pay in extinguishment of the present mortgage on the premises held by the building loan association. However that may be, Mr. Anderson, upon her instructions, prepared the mortgage here in question, and also a bond to accompany the same, which is conditioned for the payment of

"$3,000 in one year, with interest at five per cent., payable semi-annually, together with all sums of money that the said Isabelle T. Smith, her executors, administrators and assigns, may pay to the Excelsior Mutual Building & Loan Association, Series No. 2, and interest on said sums as hereinafter provided."

Thorp *v.* Smith.

Then follows a provision that those payments are to be made upon a bond and mortgage held by the building loan association upon the premises, and declaring that any money so paid by her shall become a part of the money secured by the bond and mortgage given to secure it; and the obligor authorizes the daughter to pay the sums for dues, fines, arrears, &c., on the principal and whatever might thereafter become due. The mortgage contains a clause to the same effect. Mrs. Smith further swears that the bond and mortgage being complete for execution, Mr. Anderson, at her request, called one evening on Mr. Thorp at his house, and after reading the bond and mortgage to Mr. Thorp the latter executed it by making his mark, and duly acknowledged it, and it was recorded by Mr. Anderson; all done in the presence of Mr. and Mrs. Smith.

Mr. Anderson's account of what occurred on this occasion is that he was introduced to Mr. Thorp and asked him about his health, and had the usual conversation of that kind. He said, after talking for some time:

"that he learned from him that he was to give this mortgage to his daughter; * * * that he wanted to give this mortgage in consideration of his daughter's services."

That the witness produced the bond and mortgage and read every word of it from start to finish and explained it to the old gentleman.

On cross-examination he was asked:

"*Q.* Was there anything said regarding a bond and mortgage prior to your reading it—that is, the evening that you were at Mr. Thorp's house when it was executed?

"*A.* Yes, sir; I introduced the subject.

"*Q.* In what way; what did you say?

"*A.* I think I spoke about his daughter's services, and I think he told me that the bond and mortgage was to be given for his daughter's services; and I learned from him that she had been in attendance upon him.

"*Q.* What did you say about the daughter's services?

"*A.* I cannot undertake to give language used at that time.

"*Q.* (By the Court.) Try and recall the first conversation you had with him or introduced—the very first.

"*A.* You mean just on this topic? I did say something previous.

Thorp v. Smith.

"*Q.* (By Mr. Gordon.) The first conversation at that time at the house with Mr. Thorp?

"*A.* I think I opened the conversation by asking him if he was to give this bond and mortgage in consideration of his daughter's services, and he said, 'Yes,' and made an explanation; but what that explanation was I can't recollect."

Again asked as to the whole conversation, he testified as follows:

"*Q.* (By Mr. Gordon.) The first, you say, was about his health?

"*A.* I have given you that in detail; that I remember distinctly

"*Q.* Then you asked him whether he wanted to give this mortgage to his daughter for services, and he said, 'Yes,' and that is as much as you can remember regarding it?

"*A.* I remember he told me how long she had been in attendance upon him.

"*Q.* (By the Court.) That is after you introduced it?

"*A.* Yes; and what length of service his daughter had rendered him, but what his language was I can't undertake to remember."

Nothing was said about his ability to pay the mortgage when it became due, or the interest on it, or whether it was given with the expectation that it should be paid when it matured. In fact, no questions were asked by Mr. Anderson except as I have stated, nor was any advice asked by the mortgagor. And it is to be remarked that the first mention of services as a consideration was by Mr. Anderson.

Upon the case thus made the question is whether this mortgage can stand, and I will consider it, first, without regard to the parol contract sworn to by the complainant.

It is entirely clear that if it is permitted to stand a gross injustice will be done to the son. Thirteen years of hard and grinding labor with his own hands day by day have been invested in it, to say nothing of a source of income which should have been mentioned, namely, that he worked at night as a musician and earned money which he swears—and there is nothing to the contrary—he put with the other money in paying for this house and keeping up the payments on the mortgages and the premiums on the life insurance.

The hardship of this was felt by the defendant, and much prominence was given in the evidence and argument to the value

of the established business of E. Thorp & Son, the benefit of which the son had. An attempt was made to magnify the amount of that business beyond what it really was by reference to a book which was produced by the defendants. (And I will say here that all the books of account, as far as there were any, and checks and check-stubs that had been used in the business, were left by the son in the father's house and fell into the hands of the defendants.)

The book referred to is a common, cheap paper blank-book, which was used by the father and son in making up estimates of their jobs when they were asked to bid on contracts. It was erroneously called by counsel for the defendants a contract-book. Such was not its character. It was strictly an estimate-book and nothing more. The counsel for defendants based an argument upon the great number of estimates made in this book and in his written argument made the sum total a large number. When the book was offered in evidence no such point was made about it, and the complainant was not examined in order to explain that aspect of it, and the argument just mentioned was a surprise to me and, I presume, to complainant's counsel. But a careful examination of that book and of all the other books and the bank pass-book, checks and vouchers, satisfies me that the position cannot be maintained. The simple fact is that a large portion of the estimates that appear in that book never ripened into contracts. They were merely the basis of bids which were not accepted. And a close examination easily distinguishes between those that were accepted and those that were not. Those accepted generally have on the opposite page credits for payments, and a rough account kept of the actual cost of the jobs so as to see whether the particular job produced a loss or a gain, and in some places the word "estimate" is written, and where a contract followed the bid the word "contract" is written —all in pencil.

An examination of the day-book of charges and the bank-book, and a statement made up by the cashier of the bank of the amount of deposits and drafts in each year, show the business just as I described it, namely, a small jobbing business, doing work by the day, and small repairs, with an occasional small

contract. The moneys received were mainly earnings by day labor, with a small profit on the two or three additional hands that were employed, and occasionally a small profit on a contract. The bulk of the day labor earnings came from that of the son's own hands, since the father did little after 1892 or 1893.

Then the business in itself was worth nothing. It was not the kind of a business which had any good will, so to speak, but depended entirely upon the personal character of the person carrying it on; and that character had been given to it by the complainant. It was quite absurd for the old gentleman to entertain the idea, if he ever did entertain it, which I doubt, that the fact that the son was an energetic, hard-working, industrious and saving mechanic, respected by neighbors and commanding the confidence of people who wished to employ him, constituted a matter of value in dollars and cents which should be taken into consideration in a division of this property.

The fact, then, was that the complainant had earned and contributed at least two-thirds of the whole of the old gentleman's fortune, including the life insurance money, amounting with that and the house to about $7,500; and if this mortgage is to stand he will receive, first, $1,500 of life insurance, and, in addition, one-half of what the house and lot are worth over and above $3,000, which we may call $750, making about $2,275, instead of $4,500, which he should receive upon a just division of the property.

It is manifest that the defendants were disappointed in not being able to show that the complainant had saved out of the business a considerable sum of money for himself. But they failed therein. And the result would have been the same had they succeeded, for it was undisputed that the cost of the house and lot, and the life insurance premiums, were paid out of the joint earnings; and if it had appeared that any surplus of those earnings had been received and retained by the complainant, it is quite clear that he would be liable to account for them to his father's personal representatives. On such an accounting all the credit he would be entitled to would be the amount that was devoted to the purposes just stated.

And here I may notice an attempt to contradict the com-

plainant in his statement that all his earnings, after the house was commenced, were absorbed in the common fund and devoted to the purposes I have mentioned. The complainant swears that during the three or four years he worked for his father before the house was commenced he received only small wages —$6 a week, and out of that boarded himself. He says that his father could not afford to pay him any more, and no doubt his services at first were not those of a full journeyman, but he said that during the latter part of that period of three or four years he was able to do, and did do, a full journeyman's work and was entitled to journeyman's wages. In contradiction of the statement that all of what would have been his earnings after the enterprise of building the house was undertaken went into the common fund, the defendants rely on certain entries in the handwriting of the father, found on a single leaf of the estimate book, of which mention has been made. They purport to be charges of cash to the son and cover a period from June 29th, 1885, to June 26th, 1886, composed of small sums aggregating $355, of which $152 are dated after February 20th, 1886, and cover the period after the house project was undertaken. It is urged, as to these items amounting to $152, that they clearly contradict the complainant's evidence. It may be presumed that these payments were for work and labor done, but there is nothing on the book to show at what time that work was done. It may have been done long before the payments were made. Be that as it may, it must be borne in mind that the house was not finished and occupied as a home for the father and his two children until some time in the fall of the year 1886, and that previous to that occupation the complainant was obliged to pay and was paying his board in cash and was necessarily obliged to have money enough for that purpose and his other ordinary living.

The next ground taken by the defendants to support the justice of this transaction is that Mrs. Smith sacrificed a great deal by remaining home and living with her father for about thirteen years. The fact is that in 1886 she was about nineteen years of age. She graduated on June 25th, 1885, when she was eighteen years old, from the Jersey City high school, and also

on the same day from the Jersey City training school, and she
asserts she was thereby shown to be competent to teach school
and a rose-colored schedule of wages which she was sure to
receive was made up in argument. It was urged that she had
sacrificed a great deal in giving up her prospective occupation as a
school teacher. I think it is quite plain that the question whether
a young lady who has attained the age of only eighteen and
obtained a diploma, is thoroughly fitted for a teacher of children
and could with any certainty count upon receiving a certain
scale of wages, is altogether uncertain. Besides, if she did under-
take to teach and succeeded, of course she must support herself,
and the cost of her personal support would have been consider-
able, and the cases where school teachers have made fortunes
during the first thirteen years of service are rare. But, granting
all that is claimed by her in that respect, let us see what she
will get without this mortgage, and that is one-half of a house
and lot worth $4,500, or $2,250, and $1,500 of life insurance
money, making $3,750 for thirteen years' service; and for all
those years she had her living in a comfortable house with a
servant to assist her in keeping it. She complains of the hard-
ship of housekeeping, but surely it was not greater than that
which her brother was undergoing, working steadily and faith-
fully every day with his hands as a mechanic.

Then she says that her father felt under obligations to her
for her services to him, and that is the ground given to the
counsel who drew and took the acknowledgment of the mortgage.
But I am entirely satisfied that her share in his estate was all
that she was entitled to in that respect.

Upon a very careful review of the whole case, I am satisfied
that if Mr. Thorp really entertained the notions which his
daughter and her aunt, Miss Robinson, who is plainly a partisan
witness, attribute to him, it tends strongly to prove that he was
laboring under a palpable delusion. He did not owe his daughter
any such sum as $3,000, and he was under no moral obligation
to make her a present of the mortgage and could not do so
without inflicting great injustice upon his son.

It is quite clear from the evidence that the mortgage was
given upon the idea that it was not to be enforced in the old

gentleman's lifetime.    But no protective writing was given against his liability.

I am satisfied that the daughter knew that her father was approaching his end and that there was haste in the matter, not only on that account, but because his mind was failing rapidly, and the longer the matter was put off the more difficult it would be to sustain it.    And I am further satisfied that, giving the father credit for the greatest degree of mental capacity that is possible under the evidence, his mind was not directed, as it should have been, to the question of the practical effect of the giving of the mortgage and the danger to him of its enforcement. His attention was not called to the possibility of the death of his daughter in his lifetime, in which case, of course, the husband would take the bond and mortgage and might enforce the same at once and turn the father out of doors; and, indeed, the daughter might do the same thing.

In this aspect of the affair the importance of his being furnished with the advice of a competent lawyer or business man, who should be advised as to his pecuniary situation and the duties which he owed to both his son and daughter, and be able to point out to him the result and consequences in all directions of his act, is most manifest.

Another matter comes in here.    I have shown above what I deem to be the genesis of the idea of a mortgage, and by the evidence of both Miss Robinson and Mrs. Smith it was connected in the father's mind simply with the securing to Mrs. Smith and her husband of the amount which they should advance in paying the building and loan association dues, and it was for that purpose that she was sent for a lawyer; and she admits that no sum was mentioned when she first called on Mr. Anderson; and, strange to say, she does not state that she then told him that the object of the mortgage was to secure the building and loan dues. After the first interview with Mr. Anderson the sum of $3,000 was mentioned.

Now Mr. Anderson read over the mortgage carefully to the old gentleman, but I am not satisfied from his evidence that the old gentleman understood that he was giving a mortgage to include both matters—first, a payment of $3,000, and second,

the building loan dues. It seems to me that it was quite easy for the old gentleman, in the enfeebled condition of his mind, to misunderstand the effect of the mortgage in that respect, and that there is room for the inference that he may have thought that the $3,000 mentioned was an outside figure which would cover all advances for the purpose above mentioned. The circumstances throw upon the defendants the burthen of showing that the mortgagor fully understood the effect and consequences in all directions of the mortgage. This I think they have failed to do.

Without stopping at this moment to go into the authorities, I will repeat what I have already said, that the condition of the father's mind and the influences which surrounded him were such that he manifestly needed the assistance of an independent and disinterested business man or lawyer to advise him and point out to him the effects and consequences in all directions of the act which he was doing, and that if the case rested there I should feel constrained to set aside the mortgage on the simple ground that its injustice to the son was so manifest and so great, and the mind of the mortgagor was so feeble, and the opportunity for imposition and undue influence had been so unobstructed that it would be unsafe to enforce it.

But the case does not stop there. We have the contract sworn to by the complainant. It is true that he stated in his evidence that he thought Mr. Heritage heard the conversation, and that gentleman when called by complainant did not recall it. But I see no reason to disbelieve the complainant. It is true that he is swearing to a parol contract made with his own father, and his evidence in regard to it must be scanned with great care. In that respect he stands on the same footing with his sister when she swears to the numerous declarations made by her father. But the important question is, was not the alleged contract a natural one for the parties to make, and (what is of equal importance) was it not thoroughly carried out?

Now I think the contract was a natural one to be made between the parties. The young man was twenty-six years old; had acquired a trade; was a good workman; was steady, sober, industrious and, as his sister says, stingy. Was it not natural

for him when he saw his father going into this hazardous operation, almost entirely on credit, that he should have an understanding with him as to what was to become of his own labor? The fact that it was carried out, substantially as sworn to, is proven beyond all peradventure. The son swears that he never had a cent out of the business except for his clothing and an occasional dollar for spending money, and that he contributed all his money which he earned at night as a musician. In this statement he is borne out by a careful examination of the books of account and checks. There is, indeed, toward the latter part of the period, evidence of one small sum drawn by him and put in a savings bank, but his attention was not called to that while on the stand and what became of the money does not appear. But beyond this small sum it appears affirmatively, so to speak, that he drew nothing out of the business for his own use. The whole proceeds were devoted to the purposes which I have already stated. Now it is not at all likely that this "stingy" young man would have worked all those years and devoted his earnings toward the support of his father and sister and paying for the house and lot and keeping up the life insurance of his father, in which his sister was equally interested with himself, if he had not had some such arrangement with his father as he swears he had. And whether the contract was made in such definite terms as the son swears to, matters little if there was such an understanding between the father and son. That there was some such understanding is shown by the whole history of the business, as disclosed by the documentary proofs, and there are contemporaneous declarations proven to have been made by the father which tend in the same direction.

The effect of the execution by the complainant of his part of the contract between him and his father, which I think is established, is to vest the complainant with the equitable title to the equal undivided one-half part of the property here in question, subject to the life estate of his father. Of course, in the absence of any circumstances sufficient to give Mrs. Smith the position of a *bona fide* mortgagee for value without notice, this result renders the mortgage void as against the complainant. Not only, as we have seen, was no consideration paid for the mort-

gage, but I am satisfied that Mrs. Smith had notice of complainant's rights. In the first place, complainant swears that he did notify her, and, in the next place, we have her statements, several times repeated on the stand, that she expected complainant would make her trouble about the mortgage. She did not explain how he could make trouble for her if her father was possessed of all his faculties and was laboring under no delusion or undue influence and was the absolute owner in equity of the premises he was mortgaging.

With regard to the law applicable to the case, I find it necessary to refer only to a few pertinent authorities cited by counsel.

The present case, in its circumstances, resembles *Kastell* v. *Hillman, 8 Dick. Ch. Rep. 49.* There was in that case partial incapacity, which, however, did not attract the attention of the careful and honest counsel who prepared the deed from direct instructions given to him by the decedent. There was also a contract covering the property, much like that I have found in this case, and there was the same injustice done by the conveyance brought in question; and there was the same opportunity for undue influence on the part of the grantees. I content myself by referring to what was said on *p. 63 et seq.*

Other cases containing an accurate statement of the rule covering the present case are *Mulock* v. *Mulock, 4 Stew. Eq. 594* (at *pp. 601, 603*); *Haydock* v. *Haydock, 7 Stew. Eq. 570* (at *pp. 573, 576*); *Pironi* v. *Corrigan, 2 Dick. Ch. Rep. 135* (at *p. 155*); *Farmer* v. *Farmer, 12 Stew. Eq. 211* (at *p. 216*); *White* v. *White, 15 Dick. Ch. Rep. 104* (at *p. 115*), and cases cited.

I sum up the case, outside of the contractual rights of the complainant, thus: The mortgagor was advanced in years, in feeble health, naturally of weak will, with mental powers weakened by cerebral disease, so that he did not appreciate his pecuniary circumstances and moral obligations and was unable "clearly to discern and discreetly to judge of all those things and all those circumstances which enter into the nature of a rational, fair and just disposition of his property." While in that condition he was subjected to the influence of the defendant, and executed the mortgage without having the benefit of the advice of independent and disinterested counsel given in the absence of the mortgagee, to make him fully understand, realize

and appreciate the full effect and consequences of the instrument in all its bearings. It does not appear that he understood that by its execution he put himself in the power of his daughter without anything in writing to protect him. It does not appear that he fully appreciated his obligations to his son, the complainant. The burthen is on the defendant to establish the affirmative of these propositions, and in my opinion she has failed therein.

I will advise a decree declaring the mortgage void, except to the extent of the interest moneys on the building loan mortgage accruing in the father's lifetime and paid by the defendants. The premises will be decreed to be sold under the prayer for partition. The complainant is entitled to costs up to the decree for sale, to be paid out of the defendant's share of the proceeds of the sale. The costs of the decree for sale, and of the sale itself, will be borne by each party equally.