## WILLIAM H. GROFF et al.

*v.*

## MARGARET B. STITZER et al.

[Submitted March 17th, 1909. Decided April 29th, 1909.]

1. Evidence, in a suit by executors to set aside transfers of corporate stock made by testatrix on the ground of her mental incapacity, *held* to show that testatrix was so enfeebled by disease as to render it improper for her to transact any important business without assistance of some person who could give her independent advice.

2. Where a person enfeebled in mind by disease or old age is so placed as to be likely to be subjected to the influence of another, and makes a voluntary disposition of property in favor of that person, proof that the donor understood the nature of the act, and that it was not done through the influence of the donee, is essential, and the presumption is against the validity of the gift.

3. A woman living with a stepdaughter and her son suffered a stroke of paralysis resulting in the impairment of her mental vigor and making it necessary for her to rely for her safety and comfort on the step-daughter and son. She was under the influence of the stepdaughter.—*Held*, that a voluntary transfer by her of corporate stock to the step-daughter and her son was presumptively void, and the burden of proof rested on them to show that she understood the nature of the act and that it was not done through their influence.

4. Under *P. L. 1900 p. 363* § *4*, providing that a party to any transaction with a decedent shall not be permitted to testify thereto, donees of corporate stock, when sued by the representative of the deceased donor to set aside the gift, are incompetent to testify to the transactions with the donor.

5. In a suit by executors of a deceased donor to set aside a gift of corporate stock, evidence *held* not to show that the donor understood the nature of the act, and that it was not done through the influence of donee, essential to the validity of the gift.

6. A voluntary transfer of corporate stock, in consideration of the donor receiving the dividends and the donee rendering services to the donor for life, is void when the agreement relating to the dividends and support is not reduced to writing.

7. The knowledge possessed by the cashier of a bank must be attributed to the bank, and, where the cashier had information sufficient to put him on inquiry, the bank was bound to make the inquiry.

8. A person receiving corporate stock from the owner delivered it to a bank as collateral security for a loan. The stock stood in the name of

the owner on the books of the corporation. Before making the loan the bank knew that the owner was an invalid to such an extent that she could not make a reply to the cashier's inquiry by letter and that the stock belonged to her. The bank on making inquiry would have learned that she had been stricken by paralysis resulting in loss of mental vigor to such an extent as to incapacitate her from transacting business.—*Held,* that the bank was chargeable with what it could have learned by inquiry, and it could not hold the stock as collateral as against the executors of the owner seeking to set aside the transfer on the ground of mental incapacity.

The bill in this case is filed by the executors of the will of Caroline Bowers, deceased, to set aside a transfer made by Mrs. Bowers in her lifetime of thirty-two shares of the capital stock of the Essex County National Bank of Newark, evidenced by two certificates of sixteen shares each standing in her name on the books of the bank. The transferees are James H. Stitzer, Jr., and his mother, Margaret B. Stitzer.

In the month of March, 1906, Mrs. Bowers was living with her husband in Hackettstown; she was his second wife. Mrs. Margaret B. Stitzer, one of the defendants, was the daughter of his first wife, and James H. Stitzer, Jr., another defendant, is the son of the said Margaret B. Stitzer. There was therefore no blood relationship between Mrs. Stitzer and her son on the one hand and Mrs. Bowers on the other, Mrs. Bowers being Mrs. Stitzer's stepmother. On March 19th, 1906, Mrs. Bowers was stricken with paralysis, and it is claimed on the part of the complainant that she was thereby deprived of her reason and understanding to such an extent that she was incapacitated from transacting any business. Later in the year her husband died. She was thereby left without anyone upon whom she could rely for business advice.

On June 10th, 1907, she endorsed the two stock certificates with her name. These signatures were witnessed by Mrs. Stitzer and the certificates so endorsed were delivered to James H. Stitzer, Jr., who took them with him to Philadelphia, where he resides. A short time after he offered them to the Quaker City National Bank as collateral security for a loan. The shares then stood in the name of Mrs. Bowers on the books of the Essex County National Bank. Before making the loan, and on June

25th, 1907, the cashier of the Quaker City Bank wrote a letter to Mrs. Bowers at Hackettstown, of which the following is a copy:

"Mr. James Herbert Stitzer, Jr., has left with us thirty-two (32) shares of the Essex County National Bank, standing in your name and endorsed by you with the signature of Margaret B. Stitzer as witness.

"As is customary in such cases I wish to confirm the genuineness of your signature to the certificates, there being two of sixteen shares each. Mr. Stitzer advises me that you are quite an invalid. You can therefore have someone else write the letter simply stating the signature is correct, if such is the case, then you sign it.

"Yours very truly,
"W. D. BRELSFORD,
"*Cashier.*"

On June 27th Mrs. Stitzer wrote with her own hand a reply thereto which was signed by Mrs. Bowers and herself, of which the following is a copy:

"HACKETTSTOWN, June 27th, 97. ('07)

"DEAR SIR—Your letter is received. Mrs. Bowers is quite an invalid, but I will have her sign this letter same as the certificates which she signed. I hope it will prove satisfactory.

"Yours,
"M. B. STITZER.                    "CAROLINE BOWERS."

Thereupon the certificates were retained by the bank and it began to make loans to Stitzer on the security thereof. The following loans were made to him: July 1st, 1907, $1,000; July 6th, 1907, $1,000; August 3d, 1907, $1,000; October 12th, 1907, $1,300, making a total of $4,300.

On October 14th, 1907, while the shares were still under pledge to the Quaker City National Bank, Mrs. Bowers executed a power of attorney to transfer them to Mrs. Stitzer. The transfer was actually made on the books of the Essex County National Bank on November 13th, 1907. Mrs. Bowers died two days later, on November 15th. The defendant James H. Stitzer, Jr., claims that the shares were loaned to him by Mrs. Bowers for the purpose of enabling him to use them as collateral security for a loan or loans which he might negotiate, and Mrs. Margaret B. Stitzer claims that the transfer to her was made in consideration that she should remain with and take care of Mrs. Bowers during the rest of her life. The two transactions are thus claimed to have been entirely independent of each other.

*Mr. James Fisher* and *Mr. Joseph M. Roseberry,* for the complainants.

*Mr. F. Morse Archer,* for the defendants.

HOWELL, V. C.

It is claimed on the part of the complainant that both the above-described transactions are void and should be set aside upon the ground that Mrs. Bowers was of unsound mind when she endorsed the certificates in June, 1907, and when she executed the final power of attorney to transfer the shares in October, 1907, and that if she should be found to have been of unsound mind, or incapacitated mentally for the transaction of business, the Quaker City National Bank cannot retain the shares upon the ground that it is a *bona fide* holder for value, for the reason that it had notice that the shares belonged to Mrs. Bowers and that it was put upon inquiry as to her mental capacity by the correspondence of June, 1907, herein above copied, and the other facts within its knowledge.

It will be observed that on neither of the occasions above referred to was there any writing executed between the parties evidencing the purpose for which the transfers were made, or the consideration which induced them. The transaction so far as it relates to James H. Stitzer, Jr., is put by him upon the sole ground that it was a loan of the stock for the purpose of procuring credit for himself, and on the part of his mother it was put upon the ground that she had agreed to live with her stepmother and take care of her during the term of her life.

The first inquiry will be directed to the mental condition of Mrs. Bowers on June 10th and October 14th, 1907, the former being the day on which she endorsed the stock certificates over to James H. Stitzer, Jr., and the latter the day on which she made the final transfer of the shares to Mrs. Stitzer. The most impressive testimony on this subject is that of the two physicians who were sworn on behalf of the complainant. Dr. Woodruff was called to attend Mrs. Bowers on the day on which she was stricken; he attended her until the following month of September and became very familiar with her physical and mental con-

dition. He testifies that he saw her within an hour after her stroke; that she was then lying on a couch in a stuporous condition, her left side, face, arm and leg being paralyzed; that her face was drawn to one side; that she could not talk, and did not know where she was or what had happened to her. During the time Dr. Woodruff attended her, her condition remained about the same, except that her face righted itself more or less, but her tongue continued to deviate to the paralyzed side, and her speech was thick, and she was not mentally bright. Dr. Woodruff again saw her two to four weeks before she died. She had then, he says, failed very much both physically and mentally, and could not carry on an intelligent conversation; an attendant was always necessary.

Dr. Van Syckel was first called to treat Mrs. Bowers professionally on September 25th, 1907, nineteen days prior to the October transaction. He saw her again several times during the last ten days of her life. He testified that her intellect was impaired, that she could not carry on a conversation intelligently, sometimes manifesting her weakness by crying and laughing suddenly and abruptly without ability to control her emotions. He says: "She was fair, not bright. She was paralyzed; entirely helpless," and that her condition did not improve during his attendance.

Many unprofessional witnesses were called by the complainant who testified to similar instances of weakness on the part of Mrs. Bowers, and although, perhaps, nearly as many witnesses on the other side testified to her uniform intelligence and mental capacity, I am driven to the conclusion, by a careful perusal of all the evidence, that the statements of the two physicians reflect the true condition of Mrs. Bowers's mind. It is hardly possible that Mrs. Stitzer could have remained long in the same house with a person afflicted as these physicians say that Mrs. Bowers was without having a conviction of her incapacity forced upon her, and indeed such appears to have been the case, for according to the testimony of Mrs. Baldwin, a witness for the complainant, Mrs. Stitzer while in charge of the Bowers house wrote her that Mrs. Bowers was not any better, that she did not

consider her any better, and that her mind was as bad as her body. She made a similar statement to Mrs. Dr. Van Syckel.

Among the witnesses called to support the June transaction was the wife of James H. Stitzer, Jr., who was at the Bowers homestead at the time that that transaction took place. Her statement about it is this: Her husband wanted some money, and he asked Mrs. Bowers if he could have her bank stock to borrow money on; that he explained to her just exactly what he would do with it, and how she would get the dividend, and that it would not interfere with her receipt of the dividends in any way, and then she says that he asked her over and over again, several times, if she knew just why she was doing it, because he wanted her to understand thoroughly what she was doing, and that she seemed to be perfectly willing and satisfied. This evidence, instead of making for the defence, is really in favor of the complainants. It shows that even Mr. Stitzer at that time must have had doubts about the mental capacity of Mrs. Bowers, and about the validity of the transaction on which he was about to enter.

Mr. Seymour R. Smith, another witness for the complainant, was subscribing witness to the execution of the power of attorney in October, 1907. He is president of a bank and is a man of high intelligence and of large experience in important affairs. He was called in by Mrs. Stitzer because she had learned that the document should be witnessed by some bank official. When he reached the house he found Mrs. Bowers sitting at a table; he was told by Mrs. Stitzer that Mrs. Bowers wanted to transfer the stock to her, and that she wanted him to witness the signature. He filled in some blanks in the document and laid the same in front of Mrs. Bowers, telling her what it was; either he or Mrs. Stitzer gave Mrs. Bowers a pen, and she began to write; she found difficulty in spelling her name, and Mr. Smith was obliged to help her out by pronouncing some of the letters that she was to write. During all this time Mrs. Bowers did not speak, and after Mr. Smith left the house he seems to have been so struck by the singularity of the transaction that he returned to ask her if she knew she was signing a transfer of bank

stock and whether she wanted to do it, to which she replied "yes."

There is much testimony to show that Mrs. Bowers was help-less, that she was nervous, that she would cry frequently without apparent cause, and would laugh unnaturally; that she would sit by the day and look blankly out of the window, that she had lost her memory, and, on the other hand, that from the time of her stroke to the middle of the following year she improved somewhat and was able to move about the house without much assistance, and to talk intelligently. Yet I think that the result of the testimony is that her mind was enfeebled by her disease to such an extent that she should not have been permitted to transact any important business without the assistance of some person who could have given her independent and friendly busi-ness advice, although the case is not one to which the doctrine of "independent advice," illustrated by *Slack* v. *Rees, 66 N. J. Eq. (21 Dick.) 447,* and *Post* v. *Hagan, 71 N. J. Eq. (1 Buch.) 234,* applies in all its force, for it appears that she did not dis-pose of all her property.

I think it fully appears that not only was Mrs. Bowers's mind impaired and her mental vigor diminished much below its nor-mal state, but that she was under the influence and domination of Mrs. Stitzer, upon whom she was obliged to rely for her safety and comfort. The law respecting the relations between persons so situated has been fully laid down in a long line of cases. In *Haydock* v. *Haydock (1881), 34 N. J. Eq. (7 Stew.) 570,* the court of errors and appeals, speaking by Mr. Justice Reed, says: "I take the rule to be settled that when a person enfeebled in mind by disease or old age is so placed as to be likely to be subjected to the influence of another, and makes a voluntary disposition of property in favor of that person, the courts require proof of the fact that the donor understood the nature of the act, and that it was not done through the influ-ence of the donee. The presumption against the validity of the gift is not limited to those instances where the relation of parent and child, guardian and ward, or husband and wife, exists, but in every instance where the relation between the donor and donee is one in which the latter has acquired a dominant position."

The opinion cites the case of *Huguenin* v. *Baseley, 2 L. C. Eq. 1183, and notes.* The rule was followed by Vice-Chancellor Van Fleet in *Farmer* v. *Farmer (1884), 39 N. J. Eq. (12 Stew.) 211;* in support of it he makes the following quotation from the opinion of Judge Hank in *Cowee* v. *Cornell, 75 N. Y. 91:* "It may be stated as universally true that fraud vitiates all contracts, but as a general thing it is not to be presumed, but must be proved. Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side, from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or, on the other, from weakness, dependence or trust justifiably reposed, unfair advantage in a transaction is rendered probable, then the burden is shifted, the transaction is presumed void, and it is incumbent on the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood."

The doctrine is repeated in the opinion of Vice-Chancellor Green in *Mott* v. *Mott (1891), 49 N. J. Eq. (4 Dick.) 192,* and in the opinion of Vice-Chancellor Pitney in *Thorp* v. *Smith (1902), 63 N. J. Eq. (18 Dick.) 70; affirmed, 65 N. J. Eq. (20 Dick.) 400.* There the court of errors and appeals, quoting from the opinion of Vice-Chancellor Pitney, says: "The mortgagor was advanced in years, in feeble health, naturally of weak will, with mental powers weakened by cerebral disease, so that he did not appreciate his pecuniary circumstances and moral obligations, and was unable clearly to discern and discreetly to judge of all those things and all those circumstances which enter into the nature of a rational, fair and just disposition of his property." The court of errors and appeals continuing, says: "While in that condition he was subjected to the influence of the defendant, and executed the mortgage without having the benefit of the advice of independent and disinterested counsel, given in the absence of the mortgagee, to make him fully understand, realize and appreciate the full effect and consequences of

the instrument in all its bearings." See, also, *Baur* v. *Cron* (*1906*), *71 N. J. Eq.* (*1 Buch.*) *743.*

This rule relating to the burden of proof is a rule of universal application in this class of cases, and must be applied here to the case of the defendants. It may be unfortunate that their mouths are closed by section 4 of the Evidence act (*P. L. 1900 p. 362*), so that they are not permitted to give their version of these transactions with the deceased, yet the court must look at the testimony with the limitations that the law has placed upon it, and a careful examination of the testimony shows that the burden placed upon the defendants has not been met.

I think that this, of itself, would be sufficient to avoid the transaction as between the complainant on the one hand and Mrs. Stitzer and her son on the other, but there are yet other considerations that were urged on behalf of the complainants arising out of the failure to put in writing the agreements which Mrs. Stitzer and her son say were to be performed by them, respectively, with relation to the dividends on the bank shares and to the care of the donor during her life. It was attempted to be shown that, notwithstanding the loan of the shares to Mr. Stitzer as collateral security in June, Mrs. Bowers was to continue to receive the dividends, and in the October transaction that Mrs. Stitzer should render services to the donor during the term of her life, neither of which reservations were put in writing. It was held in *Mott* v. *Mott, supra,* that in a voluntary transfer in consideration of support the omission of the agreement to support rendered the whole transaction fraudulent and void. In *Mulock* v. *Mulock, 31 N. J. Eq.* (*4 Stew.*) *594,* a son procured a conveyance from his aged mother upon conditions to be performed by him. The conveyance was held to be fraudulent and void because the reservations were not secured as perfectly as was the grant, and in *White* v. *White* (*1900*), *60 N. J. Eq.* (*15 Dick.*) *104,* Vice-Chancellor Pitney collects all the cases, and styles the omission of the reservation in such cases a fatal defect. The rule plainly applies to the matter of the dividends as well.

Having reached the conclusion that these transactions are void so far as Mrs. Stitzer and her son are concerned, it becomes

necessary next to inquire whether their infirmity reaches to the Quaker City National Bank, which holds the shares in pledge for loans to Mr. Stitzer, and this depends upon the knowledge that the bank had or was chargeable with as to the mental condition of Mrs. Bowers in June, 1907. On June 25th of that year the cashier of the bank addressed a letter to Mrs. Bowers in which he stated that Mr. Stitzer had left with it the Essex county bank shares standing in Mrs. Bowers' name and endorsed by her with Mrs. Stitzer as a witness, and that he wished to confirm the genuineness of Mrs. Bowers' signature. Then follows this statement:

"Mr. Stitzer advises me that you are *quite an invalid.* You can therefore have someone else write the letter simply stating the signature is correct, if such is the case, then you sign it."

Two days later Mrs. Stitzer, with her own hand, replies to the cashier's letter, in which she says: "Mrs. Bowers is *quite an invalid,* but I will have her sign this letter same as the certificates which she signed." Whatever knowledge the cashier had of Mrs. Bowers' condition must be attributed to the bank, and if the cashier had any information which was sufficient to put him on inquiry, the bank would be bound to make the inquiry. *Gaston* v. *American Exchange National Bank, 29 N. J. Eq. (2 Stew.) 98.*

The facts that the bank knew were—*first,* that Mrs. Bowers was "quite an invalid;" *second,* that she was so far invalided that she would not be able to make a reply to the cashier's inquiry by a letter written by her own hand; *third,* that the stock in question belonged to Mrs. Bowers. This last fact is admitted by the answer of the bank. Having this notice, was there not a duty cast upon the bank to inquire into the extent, nature and character of her invalidism? The first question that might occur to one upon whom this burden was cast would naturally be one relating to the character of her disease. This might have been made of Mr. Stitzer, who was at hand, or it might have been prosecuted at Hackettstown. If, in reply to the inquiry, the bank had been informed that Mrs. Bowers had been stricken by paralysis, could it then have stopped its inquiries and pro-

ceeded to make the loan with any degree of safety? With the well-known effects and results of this malady in mind, could the bank then have safely proceeded without going to the limit of investigation? I am of the opinion that the bank was put upon inquiry as to her state of health and the condition of her mind; that such inquiry was a duty which it could not shirk, and that it was bound by all the facts that such inquiry, if made, might lead to. This view charges the bank with knowledge of Mrs. Bowers's mental condition when it took the securities and made the loans.

In my opinion, therefore, the complainant should have the decree.