HARVEY E. HUNT, executor of Joseph Hunt, deceased,

*v.*

SILAS NAYLOR et al.

[Submitted April 6th, 1915.    Decided July 2d, 1915.]

1. Where an alleged gift of a fund by an uncle to his niece was not made until after its deposit by the niece, the issuance of a pass-book in the joint names of the uncle and niece, the handing it by the bank to, and retention by, the niece, was not a sufficient delivery, unless the uncle knew of its existence.

2. The act of a niece in depositing the funds of her uncle as a joint deposit, on the understanding that the enjoyment of the fund was to be the niece's, if at all, only on the death of the uncle, would be a disposition, testamentary in character, in violation of the statute of wills, and hence invalid.

3. Where a niece who had been reared by her uncle lived with him and his aged sister for upwards of ten years, conducting the household and attending to their affairs, and the uncle was aged, physically weak, mentally infirm, and dependent upon her, his alleged gift of a bank deposit to her raised a presumption of undue influence, casting upon her the burden of showing by clear, convincing and satisfactory evidence that the gift was his voluntary and intelligent act.

4. In such case, where the uncle's entire estate consisted of a $1,000 government bond and the bank deposit of $1,147, so that the gift of the deposit, if valid, would deprive him of more than half of his estate and leave an amount manifestly insufficient for his maintenance, there was a presumption of improvidence, casting upon the niece the burden of showing that the uncle had the benefit of proper independent advice.

---

*Mr. Edgar W. Hunt,* for the complainant.

*Mr. H. Burdett Herr,* for the defendant.

BACKES, V. C.

The question submitted for determination is: Did Joseph Hunt make a valid gift *inter vivos* to Elizabeth Naylor, *née* Hunt, of a fund of money now on deposit in their joint names in the Amwell National Bank of Lambertville? The contest is

between Joseph's executor and Elizabeth's administrator. At the time the deposit was made Joseph was eighty-eight years old, physically weak and mentally infirm, and entirely dependent upon Elizabeth. He and his aged sister, and Elizabeth, his niece, lived together, and for upwards of ten years the latter conducted the household and attended to the affairs of the old couple. They had reared Elizabeth, as well as the complainant, a nephew, who, for many years, contributed substantially toward their support. A check dated April 14th, 1910, for $1,147.44 was received by Joseph as his share of the proceeds of a sale in partition of a farm of which he was half owner. The check was endorsed by his mark and witnessed by Elizabeth, who, on April 22d, took it to the bank and deposited it in the savings department in the name of "Joseph Hunt or Elizabeth G. Hunt." The pass-book was delivered to her, together with an identification card, which she signed and took with her to obtain, and which she later did, the signature of Joseph. The pass-book contains the usual rule that it must be presented in all cases on depositing or withdrawing money and stamped on the inside is the provision: "This account is subject to the order of either the undersigned depositors; the balance at death of either to belong to the survivor." This stipulation is practically repeated, in writing, on the identification card, and, if perchance it plays any part in this case, it works in favor of the complainant, because Joseph survived Elizabeth. It does not appear that Joseph ever knew that there was a pass-book. Elizabeth kept and took it away with her after her marriage in 1912, when she left Joseph's home and went to Illinois, where she died. At the time she went away, Joseph had been declared by a commission of this court a lunatic, with lucid intervals, for upwards of a year then past. So far, the situation does not disclose a gift. The fund belonged to Joseph. He was physically unable to take it to the bank. The continued possession of the pass-book by Elizabeth, under the circumstances, and all of the other events, are entirely consistent with the theory that the joint deposit was made for convenience sake. *Skillman* v. *Wiegand, 54 N. J. Eq. 198; Taylor* v. *Coriell, 66 N. J. Eq. 262.*

The mental attitude of Elizabeth, as related by the witnesses, indicates very strongly that at the time the joint deposit was made, it was not meant to work a change of ownership, and that she so understood it.   I surmise that when the check arrived she reasoned, and, conscientiously, that for her years of toil and services rendered to her aunt and uncle, she was entitled to compensation, and the best way to secure it was to make a joint deposit, which would survive to her upon her uncle's death.   She evidently cogitated long, because the check was not deposited until eight days after its date, and in her planning she scrupled, for she sought the advice of Dr. Salmon, her uncle's physician, of whom she inquired whether he thought it would be fair if she should do it.   To the cashier, when she made the deposit, she said:

"That Mr. Hunt wanted her to put it in her own name, but she did not want to do it that way; she preferred to have it where she might control it, that is to say, drawing interest for him in his failing years."

She did not lay claim to the money.   After the check had been deposited, she told her friend Mrs. Phillips "that she was going to get someone to try to persuade Uncle Joe to leave the money to her that was in the Lambertville bank," and that that someone was a Mrs. Eva Parent.   The inference, though somewhat obscured, is that Elizabeth did not regard the fund as having passed from the ownership and control of her uncle, and that she considered herself merely its custodian for him.   An occurrence of some time later, it is contended, shows that a gift had been made.   It will be recalled that Elizabeth took the identification card home with her to secure her uncle's signature.   On this he wrote his name as joint depositor, although, singularly, his endorsement on the check was by mark.   Mrs. Parent says she was passing the house one day, when Elizabeth called her in and asked her if she were going to Lambertville soon, to which she replied that perhaps she was on the morrow; and was then asked if she did, would she come up early and stop in, as she (Elizabeth) had an errand she wanted her to do.   Mrs. Parent stopped in the next day and Elizabeth said, "Wait a minute, I want to call Uncle Joe."   When he arrived she said:

"I want you to get Uncle Joe to put his name on this signature card with mine. He gave me this money for my own, but I want him to have his money and I want the card so he at least can have the interest on the money if I should die."

To this, Joseph protested, saying: "I don't want to do it; I give this to Lizzie for her's; Mary has her share and there is plenty for the boy [meaning the complainant]." The witness urged him, saying, "You had better do it if Lizzie thinks best," to which he replied, "I don't want to do it. This is Lizzie's and there is plenty for the boy." Now, when had he given it to her, and in what manner did he transfer the title? It was apparently not until after the deposit was made, for it was after that time that Elizabeth said she was going to get Mrs. Parent to persuade him to give her the money, and if it was afterwards, then the issuing of the pass-book in their joint names, and its delivery to and retention by Elizabeth, was not a sufficient tradition, unless he knew of its existence, which, as I have said, is not shown. *Goodrich* v. *Rutland Savings Bank* (*Vt.*), *17 L. R. A.* (*N. S.*) *181*. Why Elizabeth postponed the signing of the card until Mrs. Parent called a second time by appointment, is unexplained, but it may be that on the first visit Joseph was not in a frame of mind to accede to her request. His declaration that he had given the money to her, it is true, is not irreconcilable with Elizabeth's statement to the cashier that her uncle wanted her to make the deposit in her name, nor with the notion that he gave her the check outright; but, it is in conflict with her previous utterances, to which I have called attention, and with what Joseph later told the complainant that he had received the money for the farm and that he told Lizzie to put it in the bank in their joint names, so that if anything happened to the complainant, he (Joseph) would have something to help him in his old days; and, with the statement made by Elizabeth to the complainant that the money came and she did not want it to lay around the house; that she had taken it to the Amwell bank and put it in her uncle's name and her own, and that some time when he (the complainant) came up they would go down to the bank and have his signature added. The evidence is far from satisfying me that in the first instance the uncle gave the fund, or the check repre-

senting it, to Elizabeth, with donative intent, and that he then intended to, and actually did, strip himself of all dominion over it—requisites essential to a gift *inter vivos;* or, that he subsequent to the deposit, made a gift of it to her. Elizabeth's act of making the joint deposit, and her suggestion to the complainant that his name be included as one of the depositors, challenges seriously the idea that she had become the absolute owner of the fund, and the view she entertained of her relation to it, evinces that she understood that the enjoyment of the fund was to be hers, if at all, only when her uncle had finished—a disposition, testamentary in character, in violation of our statute of wills, and falls within the rule laid down in *Stevenson* v. *Earl, 65 N. J. Eq. 721.*

But, even if all of the formalities for the making of a valid gift had been observed, with donative purpose, yet the transaction could not be sustained because of the unrebutted presumption of undue influence raised by the confidential relation which existed between Elizabeth and her aged and enfeebled uncle, and the dependency of the latter upon her, which presumption cast upon the defendant the burthen of showing by clear, convincing and satisfactory evidence that the gift was the voluntary and intelligent act of the donor. *Coffey* v. *Sullivan, 63 N. J. Eq. 296.* The failure to carry this burthen of proof brings the case directly within the doctrine laid down by Mr. Justice Reed in *Haydock* v. *Haydock, 34 N. J. Eq. 570,* as follows:

"I take the rule to be settled that where a person enfeebled in mind by disease or old age is so placed as to be likely to be subjected to the influence of another, and makes a voluntary disposition of property in favor of that person, the courts require proof of the fact that the donor understood the nature of the act, and that it was not done through the influence of the donee. \* \* \*

"The presumption against the validity of the gift is not limited to those instances where the relation of parent and child, guardian and ward, or husband and wife, exist, but in every instance where the relation between the donor and donee is one in which the latter has acquired a dominant position."

And, furthermore, if it were necessary, the principle involved in *Slack* v. *Rees, 66 N. J. Eq. 447,* could be invoked. The rule of that case is pointed out in *Post* v. *Hagan, 71 N. J. Eq. 234,* as having specific application to cases in which the gift, if valid, has the effect of stripping the donor of practically all of his property. Here the donor's entire estate amounted to only $2,147.44 —the deposit in bank and a $1,000 government bond. For his support, he depended upon the gratuities of the complainant. The giving away, under such circumstances, of more than one-half of so small an estate, the whole of which was manifestly inadequate for the maintenance of the donor, raises, it seems to me, the presumption of improvidence as effectually as if the estate had been a large one, and the proportions of the gift had resulted in leaving the same small residue.

"That a person," said Mr. Justice Garrison, in *Post* v. *Hagan,* "already aged or infirm, or otherwise dependent, should give to the one upon whom he thus depends practically his whole living beyond recall, and at the very time when apparently he had most need to retain it, raises in the mind of a chancellor the presumption that the donor may not have appreciated the irrevocable character of his act or that he did not foresee its legal consequences to himself. This presumption of apparent improvidence gives rise to the special rule followed in *Slack* v. *Rees,* which may be called the rule of independent advice. By force of this rule, if a person upon whom another has in fact come to be dependent accepts a gift from such dependent person of all of his or her estate, a court of equity, moved by the apparent improvidence of such a gift, casts upon the donee the burden of showing that the donor had the benefit of proper independent advice. Proper independent advice in this connection means that the donor had the preliminary benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefaction."

That Joseph had not the benefit of independent advice is conceded, and that his relation to Elizabeth was one of trust and dependence, was not disputed.

The complainant is entitled to a decree. Costs will not be allowed against the defendant. *Peer* v. *Peer, 11 N. J. Eq. 432.*