The present respondents excepted in the orphans court to the inventory filed by the present appellant as the executor of William Fulper, deceased, for failure to include an item of about $4,200. The decree below sustained the exception and directed the executor to add to the inventory, and account for as executor, the sum of $4,232.08 (with interest).
The undisputed facts are that the decedent, having a bank account of $4,232.08 on January 17th, 1923 (three months *Page 296 
before his death), gave John W. Fulper a check for that amount to his (John's) order, intending to make a transfer thereof to John W. Fulper, and the latter immediately deposited it in a bank to his own credit, where it still remains. He did not include this item in his inventory as executor; he claims it as his own.
The claim of the exceptants was, not that the transfer had not been made, but that it was invalid as having been made improvidently by an aged man to one in a confidential relationship, without consideration, without independent advice, stripping himself of most of his property, and that the donor was mentally incompetent, and that the gift had been procured by undue influence.
What the exceptants actually sought, therefore, was a setting aside of the gift upon those grounds. And, clearly, the operation and effect of the decree of the orphans court involves a setting aside of that transfer, for it directs the executor to inventory and account for, not a claim of the estate against the donee, but the sum of $4,232.08 received by the executor from the decedent January 17th, 1923, and, obviously, such a decree necessarily involves a finding that the sum in question is a part of the assets of the estate, and (under the admitted circumstances of this case) the sum could only become assets of the estate by a setting aside of the prior completed transferinter vivos. (The memorandum filed by the orphans court shows that the decree was, in fact, made because that court concluded that the transfer should be set aside because of lack of independent advice to the donor.)
The question occurs, therefore, as to the jurisdiction of the orphans court to make such a decree. The first impression would be that such jurisdiction inheres only in the court of chancery.
Suppose that (instead of the donee and the executor being the same natural person) the gift had been made to John Doe instead of John W. Fulper, could the orphans court make a valid decree setting aside the gift?
The orphans court has no jurisdiction (except in the case of insolvent estates) to try the validity or extent of claims of *Page 297 
creditors against the estate. Miller v. Pettit,16 N.J. Law 421; Vreeland v. Schoonmaker, 16 N.J. Eq. 512; Middleton v.Middleton, 35 N.J. Eq. 115; Partridge v. Partridge, 46 N.J. Eq. 434; affirmed, 47 N.J. Eq. 601; Mullaney v. Mullaney,65 N.J. Eq. 384 (at p. 387). Nor the claim of an alleged cestuiqui trust to establish a trust in his favor as against a portion of the apparent assets of the decedent in the hands of the representative. In re O'Callaghan, 64 N.J. Eq. 287. Nor a claim by an alleged donee inter vivos of title to a portion of the apparent assets of the estate as against the executor. In reCampfield's Estate, 98 Atl. Rep. 381; In re Estate of JamesMcSpirit, 73 N.J. Eq. 613.
So, also, in the converse instances of claim by the executor against third parties. Suits by the executor against debtors of the decedent cannot be tried by the orphans court, but must be brought in a court of law. Cf. Wood v. Tallman,1 N.J. Law 153. And jurisdiction to try an equitable claim by an executor (or by legatees in the name and right of the executor) against third parties, inheres, not in the orphans court, but in the court of chancery. Heyer v. Sullivan, 88 N.J. Eq. 165;affirmed, Ibid. 595; Vaiden v. Edson, 85 N.J. Eq. 65 (at p.69); affirmed, Ibid. 184 (at p. 189); Smith v. Jones,89 N.J. Eq. 502 (at p. 506); Cf., also, In re Dubois Estate,97 Atl. Rep. 728.
Where, however, the disputed question of title or indebtedness is one between the estate and the executor or administrator claiming in his or her individual capacity a different situation is presented and a different rule prevails. In such case the jurisdiction of the orphans court to hear and determine such issues, whether they be legal or equitable, has been asserted and upheld since the earliest times. The first reported adjudication seems to be Wood v. Tallman's Exrs., supra, where on an issue as to the correctness of an executor's inventory and account the orphans court determined the question of a debt due to the testator from the executor in his individual capacity, and charged the executor with the amount found to be due, as assets in his hands, and the *Page 298 
supreme court affirmed this on certiorari, pointing out that, although the question was one for the jurisdiction of a common law court, if the debtor and executor were separate individuals, yet where they were the same person, the executor could not sue himself as an individual, nor could anyone else on behalf of the estate sue him in a court of law; that jurisdiction over the issue, therefore, lay in chancery or the orphans court; that the orphans court had been invested with full jurisdiction to determine such issues under such circumstances, and that the debtor had consented to that jurisdiction and the loss of his right to the jurisdiction of a law court (and jury trial) by his acceptance of the executorship.
Other instances where a similar exercise of jurisdiction by the orphans court has been upheld are Dilts v. Stevenson, 17 N.J. Eq. 407; Smith v. Burnett, 34 N.J. Eq. 219; affirmed, 35 N.J. Eq. 314; Sherman v. Lanier, 39 N.J. Eq. 249; Tichenor v.Tichenor, 45 N.J. Eq. 303; Bayley's Case, 67 N.J. Eq. 566;Streeter v. Braman, 76 N.J. Eq. 371; Hill v. Hill, 79 N.J. Eq. 521.
It will be noted that in some of these cases the issues determined were issues ordinarily cognizable only in a court of law, in others they were issues ordinarily congnizable only in the court of chancery, as in the case sub judice. As was said in Wood v. Tallman, supra, the law has given the orphans court full power to compel the executors to account generally, and to decree the balance due to the legatees in their hands,without restraining them in the exercise of this power to anyparticular kinds of claims or subjects of controversy.
In Pyatt v. Pyatt, 46 N.J. Eq. 285 (at p. 288), the court of errors and appeals, in considering the orphans court and its jurisdiction, said: "It partakes of the powers of a chancery and prerogative jurisdiction, being instituted to remedy and supply the defects in the powers of the prerogative court with regard to the accountability of executors, administrators and guardians" * * *; and also said that the orphans court has full power andauthority to hear and determine all controversies respecting the allowance of the accounts of executors, administrators, guardians and testamentary trustees; *Page 299 
and further, that upon such accountings the orphans court may ascertain the condition of the estate in the hands of the accountant as fully as can the court of chancery.
These principles were reiterated and reaffirmed by the same court in Woolsey v. Woolsey, 72 N.J. Eq. 898 (at p. 900), and the court in that case also said: "In this state the orphans court and the court of chancery have a concurrent jurisdiction in matters of this nature [determining the truth and fairness of an executor's account], and it is only where there are special reasons for going into equity that that course is justified."
Again, this court held, in Dunham v. Marsh, 52 N.J. Eq. 256
(at p. 261), that the orphans court, in the determination of issues within its jurisdiction, has the power to decide any question which must necessarily be decided in order to arrive at such determination; this was reiterated in the opinion In reAlexander, 79 N.J. Eq. 226 (at p. 228), and sanctioned by the court of errors and appeals by its adoption of that opinion.
It is difficult to reconcile Mullaney v. Mullaney, supra, with the authorities which we have just been considering, but in so far as the expressions in that case are irreconcilable, it would seem that they must be deemed reversed by the later expressions in the subsequent Woolsey and Alexander Cases.
The effect to be accorded to the Mullaney opinion was assuredly deemed to be extremely circumscribed in the opinion of Chancellor Pitney, sitting as ordinary, in Hill v. Hill, supra.
The necessary conclusion seems to be that the orphans court has jurisdiction to determine questions ordinarily cognizable only in a court of equity (or a court of law, as the case may be), where such questions are involved, on accountings, in the determination of conflicting claims between the decedent's estate and the individual who is also the executor or administrator accounting; and, specifically, that in the instant case the orphans court has jurisdiction, on accounting proceedings, to determine whether or not a transfer, inter vivos, by the testator to the executor individually, should be *Page 300 
set aside for improvidence, fraud or undue influence. It will be observed that no rights of third parties are here involved, nor is there any necessity to bring in third parties in order for the exceptants to obtain a complete and adequate relief (as was the case in Heyer v. Sullivan, supra; nor any necessity for any specific form of relief which the orphans court cannot or might not be able to accord. The transfer was of a sum of money (or the equivalent thereof — a bank credit); if set aside, it involves nothing but a return thereof — a payment of money; and this, in turn, involves nothing other than a decree surcharging the executor's account — an ordinary and usual decree in the orphans court.
Does the fact that the present proceedings are on exceptions to the inventory instead of to an account make any difference? None can be perceived. The same grant of full power and authority to hear and determine all controversies respecting the allowance of accounts extends also, expressly, to controversies respecting the fairness of inventories. The nature of such jurisdiction and the methods of its exercise must needs be similar, for an inventory is essentially a part of an account, and by immemorial practice is carried into the debtor side of the executor's account.
An inventory is a statement of the assets of the decedent's estate. The obvious purpose of the requirement of an inventory is that those interested in the estate may know at as early a time as is practicable what are the assets of the decedent's estate. Controversies "respecting the fairness of inventories" can only be controversies as to (a) whether assets of the decedent have not been included therein, or (b) whether items have been included in the inventory as assets of the decedent, which should not have been so inventoried. In either class the controversy may be (and in the first class most frequently is) a question as to whether particular items omitted from the inventory are or are not assets of the estate — a question which, as we have already seen, comes within the power and jurisdiction of the orphans court fully and completely to determine as between the executor or administrator and those interested in the estate. *Page 301 
Not only does no impropriety appear in determining such a question by challenging the inventory at once instead of waiting until the accounting, the propriety of so doing is readily apparent. Witnesses may die or evidence become lost or unavailable as the result of delay. It can scarcely be doubted that one reason for the requirement of the filing of the inventory was to provide an earlier opportunity for the determination of just such questions, if they should arise. At any rate, the procedure in this state is to bring up such questions by exceptions to the inventory (Dilts v. Stevenson,supra; Pickel v. Alpaugh, 42 N.J. Eq. 630), as well as by exceptions to the account or to the inventory and account.Bayley's Case, supra.
The orphans court, therefore, not only had jurisdiction of the subject-matter, but jurisdiction to determine the question in the particular proceeding. It remains to consider the correctness of its findings on the merits.
The necessary questions involved are (1) whether or not, under the circumstances of the case, there was cast upon the transferee the burden of proving that there had been no fraud or undue influence upon his part, and that the transaction was fair and well understood; (2) if so, whether he has sustained that burden, and (3) whether or not the transferee had the burden of proving that the transferor had independent advice.
Before taking up the facts in the case, it seems advisable, in view of the apparent misapprehension of counsel as to some of the principles of law involved, to consider and to state those principles as they exist in our jurisprudence. Some misapprehensions are not unnatural in view of the very numerous reported cases involving the principles in question and the fact that in many of those cases the determination is stated either wholly or partly in terms of the facts present, rather than in terms of basic principle, thus affording ground for the belief that the determinations establish new or modified principles instead of being simply applications to the facts of the particular case of principles already well established. *Page 302 
The principles here involved are those relative to transfers from the subordinate one of two persons, between whom exists a relationship of trust and confidence to the dominant one. Where such a transfer has been made, it is voidable (in the absence of equitable defenses) at the instance of the transferor (or those standing in his stead) if there was any deception, if there was any undue influence, if there was any unfairness, any concealment, any coercion, or if the transaction was not thoroughly understood by the transferor. In any case where the avoidance of such transfer is sought, there is a (rebuttable) presumption on all these points adverse to the transferee, and the duty is cast upon him to overcome that presumption, upon each point, by a preponderance of the evidence. If he fails so to do, on any one of the points, the transfer will be set aside. In certain of such transfers, where special circumstances are present, the presumption is not rebuttable, but is conclusive, against the transferee, unless the transferor actually had competent advice from someone not tainted with any interest in favor of the transferee, and the burden of proving such independent advice, by preponderance of evidence, is upon the transferee.
All of the foregoing principles, except those contained in the last sentence, are contained either expressly or as obvious corollaries, in the statement of the law frequently quoted in the adjudications of this state —
"In all transactions between persons occupying relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, is presumed, or, in fact, reasonably exists, the burden of proof is thrown upon the person in whom the confidence is reposed and who has acquired an advantage, to show affirmatively not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood."
The language quoted seems first to have been used (in essentially the same form) by Vice-Chancellor Green in Mott v.Mott, 49 N.J. Eq. 192 (at p. 198), where the derivation andrationale of the rule is taken up at some length. It has been repeated in divers chancery opinions, such as *Page 303 Hall v. Otterson, 52 N.J. Eq. 522 (at p. 528); Clark v.Clark, 87 N.J. Eq. 504 (at p. 506), and cited in many more. It was adopted by the court of errors and appeals in Hall v.Otterson, 53 N.J. Eq. 695, and expressly reiterated by that court in Slack v. Rees, 66 N.J. Eq. 447 (at p. 449). See, also, Soper v. Cisco, 85 N.J. Eq. 165 (at p. 170).
In the great majority of causes in which this rule is invoked, the transfers sought to be set aside are gifts. Hence, in most of the reported opinions the language used deals with gifts. See, for instance, Pearce v. Stines, 79 N.J. Eq. 51 (at p. 54). In the instant case it is contended that the rule does not apply because (as it contended) the transaction was not a gift but a transfer for present consideration. It will be observed, however, that the rule applies by its terms not merely to gifts — nor even merely to transfers — but to "all transactions" wherein an advantage has accrued to the dominant fiduciary orquasi-fiduciary. Therefore, where the person seeking to set aside a transfer proves a transfer, and that a relationship of trust and confidence existed between the transferor and transferee in which the latter was the dominant part, a situation is presented which calls for the application of the rule. And in at least one of the more recent cases, Soper v. Cisco, supra, the word "gift" is not used; it is there said by the court of errors and appeals (at p. 170) that where the requisite, dominant, confidential relationship is shown, a "conveyance"
from the subordinate to the dominant one is presumed invalid and the burden cast on the transferee to rebut the presumption.
Proof of consideration for the transfer (if it existed) is at best only one element of the proof which the defendant is called upon to make under the rule. Consideration may be an important factor in any given case, as an element, for instance, in establishing the fairness of the particular transaction. In such case the burden of proof is, obviously, upon the transferee to establish that there was consideration.
Consideration, however, is not a conclusive factor under the rule. On the one hand, transfers which are without consideration — pure gifts — may be held valid, where the duty *Page 304 
which the rule casts upon the transferee is sustained by him, as in Powers v. Finnerty, 94 N.J. Eq. 193; on the other hand, a transfer may be held invalid, although it be proven that there was consideration therefor, and consideration which would be adequate as between ordinary parties. Suppose an orphan, just twenty-one, crippled and unable to earn a livelihood, dependent for support upon the income from a small estate which had just been turned over to him in government bonds by an uncle who had been his guardian, and upon whom he relied; suppose, further, that shortly thereafter the nephew had transferred to the uncle the government bonds receiving in exchange shares of stock in some highly speculative oil or mining concern. Can it be doubted that such a transfer would be set aside at the nephew's suit unless the uncle proved that the transaction was "well understood" by the nephew, notwithstanding that the market value of the bonds and the stock exchanged might have been equal on the day of the exchange? And where the consideration was grossly inadequate, still less could the mere fact of consideration conclude the matter. Cf. Coffey v. Sullivan, 63 N.J. Eq. 296
(at p. 299).
The necessity that the transferee prove that the transaction was thoroughly understood by the transferor is emphasized in the opinions in Hall v. Otterson, supra, and Slack v. Rees,supra, by the italicization of that clause in the statement of the rule. It is further emphasized by the fact that (as will hereafter be noted) the earlier judicial expressions of the law in this state required in all cases (at least where the transfer was a gift) that the transferor should have had competent independent advice. The subsequent limitation of this strict requirement to cases where the transfer left the transferor without sufficient means to support himself, does not by any means eliminate from the other cases the requirement that the transaction must have been fair and understood by the transferor.
Hence, notwithstanding the transferee may prove consideration amply adequate as between persons not occupying the confidential relationship, if he fail to prove that the *Page 305 
transaction was, under all the circumstances, fair to the transferor, and that it was well understood by him, the transfer is voidable.
This conclusion rests not alone upon the logical deduction, as shown from the established principles. In Thorp v. Smith,63 N.J. Eq. 70; affirmed, 65 Ibid. 400, the transfer was not a deed, but a mortgage acknowledging and securing an indebtedness of $3,000. Vice-Chancellor Pitney found that the relation of trust and confidence existed, with the dominance of the mortgagee; that no such indebtedness, in fact, existed; that it was clear that the parties had not intended the mortgage to be enforced in the mortgagor's lifetime; that the mortgagor had not the benefit of independent advice, and that it did not appearthat the mortgagor understood the full effect and consequence ofthe instrument in all its bearings; that it did not appear that the mortgagor understood that by the execution of the mortgage he put himself in the power of the mortgagee without anything in writing to protect him. He held that the burden was on the mortgagee to establish this affirmatively. The appellate opinion expressly adopts and affirms the findings and the statement of the law. It appeared that there had been some consideration — past services for thirteen years.
Again, in Walsh v. Harkey, 69 Atl. Rep. 726, a mother of seventy, in ill-health, conveyed to her daughter and son-in-law for a nominal expressed consideration a house and lot comprising practically all her property. Vice-Chancellor Emery found that the grantee occupied a dominant quasi-fiduciary position; that the consideration for the transfer, not expressed in the deed or any other writing, was partly past services and partly promise of future care and support; that the grantor had mental capacity to understand the transaction, but that there was no independent advice and no proof that she did understand and appreciate the full effect and consequence of the transfer, the effect of the deed in legally divesting her of her property and leaving her without any writing of any kind to secure her. The deed was therefore held voidable and set aside. *Page 306 
In Farmer's Executor v. Farmer, 39 N.J. Eq. 211, a transfer of a promissory note was set aside because of failure to sustain the burden imposed by the rule, although the transfer was by endorsement, and, hence, legal consideration therefore was primafacie presumed.
In Mott v. Mott, 49 N.J. Eq. 192 (at p. 209), it is expressly held a fraud for a son "to permit his agreement to support his mother, the only consideration for this conveyance, to rest in parol."
Cf. also Mulock v. Mulock, 31 N.J. Eq. 594, and White
v. White, 60 N.J. Eq. 104, holding that conveyances made with reservations or conditions are fraudulent and void where the reservations "were not secured as perfectly as was the grant."
It seems clear, upon consideration, that these expressions in the last-mentioned cases are, doubtless, reflections of the facts in the particular cases, and are somewhat too broad as general statements of principle. It cannot necessarily be a fraud to accept a transfer in exchange for a mere verbal promise to support, since, as has already been noted, the transfer without any consideration may be valid, if well understood. And inVoorhees v. Christie, 96 N.J. Eq. 337 (at p. 339), it is pointed out that a promise of future support, as consideration for a transfer, is perfectly legal even if only verbal. The real basis of these decisions, it is conceived, must necessarily be the principle that the proof of verbal promises as consideration for, or by way of reservations or conditions of, a transfer, is not per se sufficient to establish the validity of the transfer; there must be always proof that the transaction was thoroughly understood by the transferor. The determination inVoorhees v. Christie, supra, in nowise indicates any recession from this principle; for although a transfer on consideration of mere verbal promise of future support was held valid, it was found as a fact that the transferor had had competent, independent advice, and that she not only was advised of, but fully comprehended, the nature and consequences of her act (at p. 340), and also that there had been no fraud or over-reaching *Page 307 
(at p. 341). Moreover, it is not clear from the opinion that the court was satisfied that the dominant confidential relationship was proven.
The latest case bearing upon this phase of the subject isKern v. Force, 97 N.J. Eq. 443; 99 N.J. Eq. 300, affirmed on the chancery opinion. The opinion, unfortunately, is not as explicit as might be desired from the standpoint of the present consideration, but it appears that a mother, a few years before her death, had conveyed to a daughter with whom she lived, real estate worth over $16,000, and which comprised, at least, a substantial portion of the grantor's property. The only consideration of which any proof was given was a promise, apparently verbal, to take care of the grantor for life. It does not appear whether the court found, as a fact, that such a promise had been made; the court does find that there was no performance of such a promise. The determination (at p. 1093) shows that the court deemed that there was some slight consideration, but, nevertheless, that the burden was upon the grantee to disprove fraud, undue influence and oppression, and to prove that the grantor acted voluntarily and with full understanding, and that this burden had not been met.
As to the necessity for independent advice, the earliest New Jersey case in which a rule in this behalf is expressed seems to be Haydock v. Haydock, 34 N.J. Eq. 570, a case of gift set aside in the court of chancery. The court of errors and appeals in affirming said: "Where parties hold positions in which one is more or less dependent upon the other, courts of equity hold that the weaker party must be protected, and they set aside his gifts if he had not proper advice independently of the other." This was repeated by the same court in Slack v. Rees, supra (at p.449), followed in Thorp v. Smith, 65 N.J. Eq. 400, and again in Albert v. Haeberly, 68 N.J. Eq. 664. In none of these pronouncements is there any expression of limitation of the rule to cases where the gift is of all, or most, of the donor's property. In Post v. Hagen, 71 N.J. Eq. 234 (at p. 236), this distinction is made, and the application of the rule requiring *Page 308 
independent advice has since then been limited to cases where the transfer has comprised so much of the transferor's property as to leave him without means of support. Groff v. Stitzer, 75 N.J. Eq. 452
(at p. 458); Pearce v. Stines, 79 N.J. Eq. 51;Hunt v. Naylor, 84 N.J. Eq. 646; Grimminger v. Alderton,85 N.J. Eq. 425 (at p. 434); affirmed, 86 N.J. Eq. 247; Siebold
v. Zieboldt, 93 N.J. Eq. 327; affirmed, Ibid. 500; Morrison v.Morrison, 94 N.J. Eq. 646; affirmed, Ibid. 801. The MorrisonCase last mentioned squarely holds that the rule as to independent advice is not applicable when the transfer is not improvident.
Is the application of the rule of independent advice still further limited to cases where the improvident transfer is a gift? It is true that the language in Daly v. Eichkoff,98 N.J. Eq. 404, seems to answer this question in the affirmative. Further consideration of the case and of other reported adjudications, however, makes it seem doubtful that either the appellate court or the court of chancery intended to go quite that far. It would appear that what the court had particularly in mind was the lack of dominance by the grantee, the independent advice actually had by the grantor and the adequacy of the consideration actually received. Examination of the briefs in the appellate court shows that the point was not therein mentioned in any way.
In Post v. Hagen, Slack v. Rees and Haydock v.Haydock (all supra), and in almost all the other cases, especially the latter ones, involving the rule of independent advice, the expression of the rule has been in words which literally carry its application no further than cases of gift. Is not this, however, simply fortuitous and without real significance, due to the circumstance that in all of those cases the transfers sought to be set aside were, in fact, gifts? The purpose of the rule, as is stated in Post v. Hagen (at p.244), is "to afford him protection against the consequences of voluntary action on his part, induced by the existence of the relationship between them, the effect of which upon his own interests he may only partially understand or appreciate." And the rule (at p. 242) "has specific application to cases in *Page 309 
which the gift, if valid, has the effect of stripping the donor of all, or practically all, of his property." In Pearce v.Stines, supra (at p. 55), it is pointed out that the deduction to be drawn from the cases is that the rule is meant to prevent a donor from giving away, irrevocably, so much of his property as to leave himself an object of charity, without advice. This seems amply confirmed by the subsequent determination (already considered herein) limiting the rule to cases of improvidence.
If, then, the purpose of the rule is to prevent one under the influence of a dominant confidential relationship from divesting himself irrevocably of so much of his property as to leave himself a probable object of charity, unless he shall have had independent advice, of what moment is it whether he so divests himself by gift or by a transfer for which the consideration is so inadequate or so insecure that the net result thereof is to make it likely that he may be an object of charity? Is the protection of the rule to be withheld, in a case in which it would otherwise be applied, merely because the transferor has received in return a consideration worth one dollar, or a hundred dollars, or five hundred dollars? If so, for what reason? None is readily apparent.
If a transferor should convey all of his property, worth say $10,000, to one in a dominant confidential relationship, receiving an actually paid and duly proven consideration of one dollar or five dollars, it would seem scarcely open to doubt that a court of equity would treat the transaction precisely as if it had been a pure gift. This was the situation in McCully v.Rowland, 94 N.J. Eq. 57, and the court of chancery in setting aside the conveyance rested its determination on two grounds — one being the lack of independent advice, and the other that the facts showed mental incapacity of the grantor. In Walz v.Oser, 93 N.J. Eq. 280, the transfer of property was made by a woman to a corporation which was practically a "one man" corporation — an alter ego of a person who had a dominant confidential position toward the transferor; as consideration for the transfer the corporation issued her its stock in an amount equal in par value to the value of the *Page 310 
property, but the actual value of which stock was very small, because the corporation was in failing circumstances and shortly after went into receivership. The transfer was set aside on two grounds — one the lack of independent advice and the other theultra vires act of the corporation. In Mott v. Mott, supra, the transfer was in consideration of a verbal promise to support for life. The lack of independent advice was held to be an evidence of fraud. In Walsh v. Harkey, supra, an "improvident" transfer was set aside for lack of independent advice, notwithstanding the consideration of verbal promise of support for life. These two cases were cited by the court of errors and appeals in Soper v. Cisco, supra (at p. 169), with no expression of disapproval, but distinguishing them from the facts in the case then at bar. In that case the transfer comprised the transferor's whole estate, but it was made in consideration of promise to support for life, and that promise was not verbal, but was expressed in the deed of transfer. It was held (at p. 174) that the rule of independent advice did not apply because the transaction was not a voluntary gift but a transfer for valuable consideration which was not improvident but provident. In Collins v. Collins, 63 N.J. Eq. 602, an aged man transferred all his remaining property to a son, an "improvident" transfer, leaving him practically destitute notwithstanding the reservation of a life estate. There was doubt whether no consideration, or a consideration of $500, was paid. The $500, if paid, was an inadequate consideration. It was held, the transfer must be set aside, in either event, as an improvident one, for lack of independent advice. This case was cited with approval in Siebold v. Zieboldt, supra, and the latter opinion was affirmed and adopted on appeal. 93 N.J. Eq. 500.
In the Siebold Case itself the transfer was set aside as improvident because of lack of independent advice (at p. 329). It is true that the transfer is there called a "gift," but it appears (at p. 330) that there was, in fact, the consideration of a verbal promise of support for life.
Prior to the Daly v. Eichkoff opinion, therefore, it would seem that the rule (and a thoroughly logical one) to be deduced *Page 311 
from the determinations in the court of chancery and the court of errors and appeals was that the rule as to independent advice applied to all cases of "improvident" transfer to a fiduciary orquasi-fiduciary, whether or not there was consideration for the transfer; that the test was not whether or not there was consideration for the transfer, but was the transfer improvident. If the transfer was a gift, and left the transferor without sufficient means to support himself, it was improvident, and the transferee must prove the independent advice; so, also, if there was consideration but the consideration was inadequate and the net result of the exchange was to leave the transferor without means of support, and that a written promise to support the transferor for life was sufficiently adequate to prevent the transfer from being improvident, but a verbal promise was not.
The opinion in Voorhees v. Christie, supra, is in nowise in conflict with this. There a transfer was made in consideration of a verbal promise to support for life. It is not clear whether or not the appellate court was of opinion that the rule as to independent advice should be applied; indeed, it is not clear that the court was of opinion that the dominant confidential relationship was proven so as to bring into operation the presumption of fraud, undue influence, unfairness and lack of understanding. The determination is on the facts, and finds that there was independent advice, and that there was full comprehension and no unfairness or undue influence.
In view of this prior state of the law, therefore, apparently resting upon the authority of the appellate court (vide theSiebold Case), it seems doubtful that it was intended by theDaly v. Eichkoff opinion to change or overrule the principle, apparently, earlier adhered to. It is further to be noted, not only that the determination in the Daly Case was rested upon two other grounds as well (that there was no dominant relationship, and that there had been independent advice), but that the fact to which the court attached weight was that the consideration was adequate, and that the further fact was that the transferor was in nowise left destitute as the net result of the transaction; she had *Page 312 
the $3,000 and she also had other valuable property in addition, as clearly appears.
If the rule be that where the dominant confidential relationship exists, a transfer as well upon consideration as without, requires proof of independent advice if the consideration be inadequate and the net result of the exchange makes the transfer "improvident" in the sense laid down by the cases, it may be worth while to consider the other reported cases where the consideration has been a promise to support the transferor for life. That is the consideration alleged by the present appellant to have been given for the transfer now subjudice.
Where such promise is written or expressed in the instrument of transfer, the transaction is not an improvident transfer, and the rule as to independent advice does not apply. Soper v.Cisco, supra (at p. 174).
Where the promise is merely verbal, if the transferor retains sufficient property to prevent the transfer from being "improvident," the rule as to independent advice does not apply.Groff v. Stitzer, 75 N.J. Eq. 455; 77 N.J. Eq. 260; Cf.,
also, Kern v. Force, supra, and Voorhees v. Christie,supra.
Where the promise is merely verbal, and the transferor does not retain sufficient property (aside from the promise) to prevent the transfer from being improvident, the rule as to independent advice does apply. Mott v. Mott, supra; Walsh v.Harkey, supra; Siebold v. Zieboldt, supra; Ibid. 500. In theMott Case it is said that the failure to express the verbal promise in writing was itself a fraud. This is obviously too broad a statement; the verbal promise is not in itself illegal as is pointed out in Voorhees v. Christie, supra (at p. 339). The conduct of the transferee in this behalf was, of course, relevant and material in determining the question as to whether there had been fraud or unfairness.
Apparently, the only other reported case touching upon the question of promise to support as consideration for a transfer isCoffey v. Sullivan, supra. There the alleged verbal statement by the transferee was not a general promise to *Page 313 
support, but a promise to use the transferred property for the transferor's support — a parol trust — and the court did not consider what the result would have been had there been a general promise.
The rule apparently to be deduced, unless Daly v. Eichkoff, is to be taken to overrule it, is that a transfer, which would be deemed improvident if there were no consideration, is not saved from being improvident by a mere verbal promise to support for life.
The proof as to competent, independent advice, where such proof is requisite, must be that such advice was actually given to the transferor. Pearce v. Stines, supra (at p. 55); Kelso v.Kelso, 96 N.J. Eq. 354 (at p. 357); Graziano v. Lanuto,97 N.J. Eq. 182.
Moreover, the recent case of Bumm v. Smyth, 98 N.J. Eq. 133,
seems to indicate that the transferor must have received the competent, independent advice at the time of the making of the transfer. In that case the grantor had competent, independent advice at the time of the drafting of the deed, warning her of the danger of making the conveyance, as the result of which she did not execute the conveyance until over a year later — three days after a stroke of apoplexy — at which time she had no advice. The setting aside of the conveyance seems to be rested on two grounds — the lack of independent advice at the time of execution and the finding that the execution was the result of the will of the grantee rather than of the grantor.
As to the existence of the dominant confidential relationship (on proof of which the burden of disproving the presumptions heretofore considered is cast upon the transferee), the burden of proof is, of course, on the party seeking to set aside the transfer. Where such relationship is not shown the presumptions against the transferee are not raised, even though the transfer be without valuable consideration and be improvident. James v.Aller, 68 N.J. Eq. 666; Kelso v. Kelso, supra; Fretz v.Roth, 70 N.J. Eq. 764, evidently rests on the same ground (the husband being, naturally, the dominant spouse); also Le Gendre
v. Goodridge, 46 N.J. *Page 314 Eq. 419; affirmed, 48 N.J. Eq. 308 (where the alleged dominance of the grantee was disproved); Wilkinson v. Sherman, 45 N.J. Eq. 413
(where neither the alleged dominance of the grantee nor the alleged mental incapacity of the grantor were proven);Laing v. Durand, 84 N.J. Eq. 404 (at p. 408); Collins v.Collins, 45 N.J. Eq. 813 (at p. 820; Morrison v. Morrison,3 N.J. Adv. R. 1171 (at p. 1176); Sherman v. Gleason, 3 N.J.Mis. R. 708 (at p. 709), and Clark v. Roeder, 99 N.J. Eq. 137.
The nature of that dominant confidential relationship is difficult of exact definition or delimitation. The relationship includes not only all cases of technical, legal, fiduciary relationship, such as guardian and ward, principal and agent, trustee and cestui que trust, but also all cases where trust and confidence actually exist. It comprehends, as is said inCowee v. Cornell, 75 N.Y. 91 (quoted in Mott v. Mott,supra, and in other cases in this state), all cases where "the relations between the parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from over-mastering influence; or on the other from weakness, dependence or trust justifiably reposed, unfair advantage is rendered probable." It exists, as is said, in Slack v. Rees, supra, when the parties occupy "relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, or, in fact, reasonably exists;" "where the parties hold positions in which one is more or less dependent on the other."
Among the confidential relationships natural in their origin, are, of course, those of parent and child. Where a father is mature and a son is young, the latter is the dependent and the former the quasi-fiduciary. When the son is mature and the father dependent the situation is reversed. Cf. Mott v. Mott,supra (at pp. 199, 200). Ordinarily, the husband stands in a dominant confidential relation toward the wife. Farmer'sExecutor v. Farmer, supra (at p. 216). Actual circumstances may, however, reverse this, as was found in Graziano v.Lanuto, supra (at p. 17). *Page 315 
As to the precise circumstances under which the son is deemed dominant and the father dependent, obviously, no hard and fast rule can be laid down. The conclusion must be drawn in each case from the particular circumstances there existing. It might be inferred, and not without justification, from some of the expressions in some of the adjudicated cases, that there must, necessarily, be present some mental weakness or deficiency on the part of the father. Cf. Groff v. Stitzer, supra (at pp. 458,459); Grimminger v. Alderton, supra (at p. 435). (These expressions also are, doubtless, due to prior expressions of determinations in terms of the facts presented rather than in terms of basic principle.) Consideration of the whole field of similar cases, as well of the basic principles, shows, however, that mental weakness is by no means a necessary circumstance. It is, of course, a fact of very great weight, if it exists, so much so as, doubtless, to be practically conclusive, if the mental or volitional deficiency be at all marked, and if there exists confidence of the grantor in the grantee. And the question of mental weakness is, perhaps, more nearly a controlling circumstance as between persons who are not parent and child or blood relatives (as they were not, in fact, in Groff v.Stitzer, nor in Grimminger v. Alderton, where the grantor was the husband of the grantee). See Myers v. Abbott, 98 N.J. Eq. 574.
But that mental weakness is not a necessary factor as between parent and child is shown by Slack v. Rees, supra, where it was found as a fact (at p. 448) that the grantor had adequate mental capacity, and Post v. Hagan, supra, where a similar situation appeared (at pp. 236, 237). It also appears bySoper v. Cisco, supra (at p. 170), where a mother seventy-seven years old, of "at least average mental and physical health" for her age (at p. 172), made a transfer to a daughter, aged forty-five, with whom she lived and upon whom she was practically dependent, and the same court holds that, without doubt, the dominant confidential relationship was shown and the burden cast on the transferee. In Kelso v. Kelso, supra (atp. 385), it is said (italics mine) "either the bodily or the mental condition of a father may *Page 316 
reverse the original relation and make his child the dominant one of the two." In Douglas v. Spear, 97 N.J. Eq. 25, it was found that a son occupied the dominant confidential position toward a mother of high intelligence and strong memory and mental powers.
As it is expressed in Soper v. Cisco, supra, (at p. 170), "where facts are shown, other than the mere relation of parent and child, establishing between the parties a confidential relation in which the child is the dominant party," a situation is shown which raises the presumption of invalidity against a conveyance by the parent to the child.
Before taking up the application of these principles to the facts in the case sub judice, there may be considered another legal question arising on this appeal. The transferee was permitted, against objection by the exceptants, to answer, in the negative, the question, "Did you ever use any influence whatever to induce your father to transfer his account in the Hunterdon County National Bank?" This seems clearly to have been error. It has repeatedly been held that, under section 4 of the Evidence act, on exceptions to an executor's account, the executor is not a competent witness in his own behalf to testify to transactions with the testator against objection. See Smith v. Burnett,supra; affirmed, 35 N.J. Eq. 314. In the appellate opinion (atp. 321) it is pointed out that the purpose of the statutory restriction is "to provide that when one of the parties to a litigated obligation is silenced by death, the other shall be silenced by law;" and further (at p. 322), "the object [of the legislation] is to close the mouth of a party whose interest is antagonistic to the estate of a deceased person in regard to those transactions and conversations in which the deceased bore a part, and concerning which he, if living, would be the most important, perhaps the only, witness beside the opposing party;" and the opinion proceeds to point out that the executor, in offering himself as a witness, did so, not as executor nor in any endeavor to act for the benefit of decedent's estate, but as an individual and against the interests of the estate, which interest was really represented by the exceptants. Precisely *Page 317 
the same situation existed in the instant case. The wording of the present statute is slightly different from that of the statute considered in Smith v. Burnett, supra, but the spirit and effect are still the same, and the rule remains unchanged.In re Atkinson's Estate, 86 N.J. Eq. 173 (at p. 175).
The authorities relied on by the present appellant are all cases of probate contests where an executor-proponent who was also a beneficiary under the will has testified that he used no undue influence over testator to induce the making of the will. These, however, are in nowise pertinent. The statute, by its terms, applies only to civil actions. "Proceedings for the probate of a will are not a civil action but a judicial inquiry to ascertain whether the instrument before the court is the last will and testament of the deceased," hence, the statute does not apply. Veazey's Case, 80 N.J. Eq. 466 (at p. 470).
The further argument by appellant that testimony that no influence was used is not prohibited by the statute, is quite obviously specious. It is conceived that the argument is not even supported by the letter of the statute — testimony that there was no transaction with the testator is testimony "as to any" transaction with the testator. In any event it assuredly comes within the spirit and purpose of the legislative prohibition, which can be "effectually invoked if requisite." Smith v.Burnett, 35 N.J. Eq. 314 (at p. 320). "The test * * * in ascertaining what is a `transaction with' the deceased * * * is to inquire whether, in case the witness testify falsely, the deceased, if living, could contradict it of his own knowledge."Van Wagenen, Administrators, v. Bonnot, 74 N.J. Eq. 843 (atp. 847).
Turning now to an examination of the evidence, it appears without doubt that the burden of establishing the validity of the transfer rested upon the appellant. There was a transfer to him of over $4,000, and the evidence is amply sufficient to show that he occupied a dominant, confidential relationship toward the transferor.
The transferor and transferee were, respectively, father and son — the son in the prime of life, in good health mentally *Page 318 
and physically, and the father eighty-six years old. The evidence shows that whatever may have been the fact as to the old man's ability and independence of action in business matters prior to December, 1922, he had nevertheless been in the habit in his latter years of going to his son for assistance in business matters, and of spending his winters in the son's home; he gave the son a joint and several power over his checking account; there was physical feebleness such that he had to have help in signing his name; there was, in some degree, at least, an impairment of memory, and that for a few weeks prior to the transfer he had been quite ill at the home of his son, and physically dependent on the son and the son's wife for care and attention.
The uncontradicted testimony of Dr. Boyer is that the testator was taken down with a serious bronchial cold on December 16th, and for which the doctor visited him daily for a week, and from which he recovered sufficiently to be able to get out a day or two after December 26th; that although he made a good recovery "considering his age," it nevertheless left him in a considerably weakened condition, for which the doctor was called in to treat him on January 5th, 15th, 20th and 25th. "He never gained a great deal of strength after his first illness, though he was able to go out." On January 5th, and on January 15th and 20th (two days before and three days after the transfer), the doctor found him in this weakened condition, with appetite poor and difficulty in breathing. He was much weaker still in April, and died April 21st of hemorrhage of the bowels.
It is evident, therefore, that there was a condition of advanced age, weakness, bodily infirmity, and of physical dependence on the son, and the actual repose of trust and confidence in the son — thus casting the burden of proof above mentioned upon the son in order to establish the validity of the transfer.
In the instant case the transferee sought to establish that there was consideration for the transfer, to wit, past services and a verbal promise by the transferee to support the transferor for life. *Page 319 
Admittedly, there had been past services furnished by the son and his wife, to wit, board and lodging for a month or two in the winter for several years, and occasional visits in the summer, for which the father made no payment. As to this, however, it is quite evident from the testimony that there was no promise to pay, express or implied; no account was attempted to be kept, except for an occasion of nursing in 1921. There was, it is said, a general statement by the testator a year or so before his death that they would be well paid some time — which, apparently, referred to a testamentary preference given to the son and was so understood, as no account was kept even after that. In fact, the wife testified, "we wasn't keeping him for money." And she further testified at several times to the effect that the consideration for the transfer was that the son should take care of him for the rest of his life. This excluded past services.
The past services, therefore, cannot be deemed established as consideration or even part consideration for the transfer. Cf.Reeves v. White, 84 N.J. Eq. 661 (at p. 662).
Nor does it appear to this court that the alleged consideration of the promise to support in future has been established (and no other consideration is alleged or intimated).
The testimony as to the son's alleged promise is that of two witnesses, the son's wife and a man, Lyons (who had bought timber on the testator's farm). Lyons testified that in conversation with the testator in June, 1922, the latter said to him: "Next month * * * I am going up to stay with John, and I expect to give John this money [the money in bank] to keep me the rest of my life." No credence can be given to this testimony. Not only is his subsequent cross-examination replete with contradictions, inconsistencies, evasions and attempts to evade, but it is testified by several of the testator's relatives that in August, 1923, after the inventory was filed which omitted the bank deposit, they went to see Lyons and told him that John claimed the bank deposit in consideration of taking care of his father, and he (Lyons) said that that was an outrage and crooked work. Lyons made no serious attempt to deny this conversation (although several *Page 320 
of his answers were "I don't remember," which obviously could not have been true as to a conversation of such a character only six months before), and it is very evident from the character of his replies that it did, in fact, take place. He admits that he said nothing to them about his alleged conversation with the testator above referred to. The conclusion is inevitable that the testator never made any such statement to him.
The wife's testimony is that the transfer was made pursuant to a verbal bargain made one or two weeks earlier. Her statement on direct examination was that without any preliminaries the testator said to his son, at the supper table: "John, I am going to give you the money I have got for what you have done and to take care of me the rest of my days. Will you do it?" That John replied, "I will;" that testator said, "I want good care," and John replied, "you shall have it."
On cross-examination she said the testator said, "John, if I give you my money that is in the bank will you take care of me the rest of my days," and a little later in her testimony, "will you take care of me for the rest of my days for the money I have in the bank?" It will be observed that both these statements omit any reference to "what you have done" or past services, as part consideration, and put it solely on the ground of promise to care for him in future.
The issue as to whether any such promise was made by John rests entirely on the wife's testimony. There is no written promise in evidence, nor any intimation that any was ever executed. No other witness is produced, although the wife's sister and mother were part of the family in December, 1922, and have been ever since, and in the ordinary course of events would in all probability have heard some reference to the matter; the wife says the old gentleman referred to it on a number of occasions, expressing his satisfaction that the transfer had been consummated. The wife's interest is obvious; though indirect, it is strong, and naturally affects the weight to be accorded her testimony. Moreover, her credibility is impaired by other parts of her testimony. *Page 321 
She testified that she did not know whether she had read the old man's will, nor whether she had heard it read. It is not believable that she did not know whether she had or not. She said she commenced to keep an account of her nursing after the testator hurt his arm, and discontinued it because he said she was to be well paid for it, and later denied that this was the reason she discontinued it. She said the old man's statement that she was to be well paid was made for the first time after he hurt his arm, and later denied it and denied that she had so testified. She testified that she noticed no difference in the physical condition of her father-in-law in the last two or three years of his life, which, of course, obviously was not true in view of his illness in December, 1922, and his weakened condition thereafter. She, herself, said he was weaker in February, 1923, than in January, and she was confronted with a letter written by her in February, 1922, in which she said her father-in-law could not even at that time get around like he used to, and she then admitted that that was true. She said the testator, in January, 1923, would go to the store every day when he was feeling all right, and later contradicted this. At one time she said the two men did not have the bank book when the check was made out and signed — at another time she says they did. And there are other instances which need not be detailed.
In view of all this it seems impossible to accord probative effect to her testimony as to the alleged promise of her husband — even in the absence of direct contradiction (which, from the nature of the circumstances, was impossible). Moreover, although there is no direct contradiction, there is indirect contradiction of considerable weight.
The testator had made a will in 1909, leaving his estate one-third to his son, John, one-third to his daughter, Annie Conover, and one-third to his grandchildren Norman Fulper and Mary Fulper (Lerson), over and above a legacy of $500 to John and one of $100 to a granddaughter Stout. Admittedly, the friendly relationship between the testator and all these beneficiaries continued up to testator's death; *Page 322 
the will was unchanged and duly probated. Admittedly, all of the beneficiaries were on friendly terms with each other until after testator's death, and all lived within a few miles of each other; but no word was sent by John and his wife to any of the others as to the old man's illness or weakened condition. Admittedly, no one of them saw him alone after the illness in December. No intimation was given by John to anyone that the old man had made this alleged bargain or transferred the bank account, which so seriously depleted the estate. (There is a controversy, to be considered later, as to whether the bank account comprised three-fourths or four-sevenths of the estate.) The family all attended the funeral, but still John said nothing and did not read the will. He says he expected them all to return to the house after the funeral and intended then to read the will, but that some did not return and he did not read it. Admittedly, he made no effort to communicate with any of the beneficiaries, and finally, a week or so later, one of them (Norman Fulper), telephoned him about it. John says he told Norman he would fix a time and notify them all. Norman denies this. Admittedly, John did not fix a time. Shortly thereafter the three other residuary legatees called on John to get him to read the will. He refused to do so, giving no reason; told them he would probate it in due course and they could go to the surrogate's office and read it there and "pray over it and cry over it;" that he didn't give two cents for any of them, and when asked by his sister as to why she had not been notified of her father's illness, said there was no law compelling him to notify her. He did not read them the will, nor say anything about the transfer.
He did not file an inventory within the three months. The surrogate wrote him, in response to inquiries by the beneficiaries, and he filed it (a very brief affair) a few days later. The three other beneficiaries, after having seen the inventory as filed, went to see John, told him they understood the testator had had considerably more money and asked as to what had become of it. John refused to tell them, saying they would find out when "the proper time" came. *Page 323 
They said they thought now was the proper time, but he still refused. Thereafter they consulted counsel, who wrote on their behalf to John, and he sent a reply through his lawyer, mentioning the transfer for the first time, saying that the bank account was transferred to John "in return for John W. Fulper's taking care of William Fulper." It is to be noted that the consideration is here given as the past services, no mention or claim being made of any promise by John, and it is further to be noted that although he had said he would explain it to them, he never did give, nor attempt to give, any further information about the occurrence to any of them. He testified that one reason he refused to give them any information, when they came to ask him, was because he wanted his lawyer present.
The result of the analysis and consideration of all this evidence leads to the conclusion that the son has not borne the burden of proof cast upon him under the law. It may be added that the wife's statement that her husband used no fraud or influence not only is of no greater weight or effect than any other part of her testimony, but obviously would be of little weight in any event, since she could have no knowledge of what transpired when she was not present. The appellant's own testimony that he used no undue influence was incompetent and cannot be considered; but even if this were otherwise, it would not avail to turn the scales in his favor.
It may further be observed that the conclusion adverse to the appellant does not rest alone upon the failure to accept as an established fact the story that he gave his promise to support his father for life as consideration for the transfer. If we assume that the promise to care for and support was made, it was a mere verbal promise, and with no witness but the son's wife.
There is no sufficient proof that there was no fraud, or that there was no undue influence, preliminary to and resulting in the alleged verbal agreement. There is no proof that the transaction was "well understood," as the law requires; no proof that the old man realized that after he had *Page 324 
turned over this $4,200 he might not be able to recover it or to enforce the verbal promise if the son and his wife should deny it, or should die.
Moreover, the facts are such as to cast on the appellant the burden of proving that the transferor received competent, independent advice. In addition to the dominant confidential relationship, the transfer was one which must needs be deemed improvident, in view of the small estate of the testator and the amount of the assets transferred.
In addition to the bank account transferred, it appears that he had other personal assets of less than $700 and a small farm — nothing more. The uncontradicted evidence before the orphans court was that the farm was worth only about $1,000. Application was made at the hearing on the appeal for leave to introduce evidence that it had been sold, the day before the hearing, for $2,500. This was denied for two reasons — one, because the failure of the appellant to attempt to establish, before the orphans court, any higher value than $1,000 indicated that the latter was a fair estimate of its value, and, hence, the testator's idea of its value at the time of the transfer. The other reason was because the situation as to improvidence would still remain though the value of $2,500 be assigned to the farm. Even at that figure, the transfer was of about four-sevenths of his total assets, and what is still more important, the assets remaining were utterly insufficient with which to maintain himself — $600 or $700 in money and a small farm which by reason of his physical condition he could not till himself, and which could not be rented (it had not been tilled for quite a number of years, its buildings were in tumbledown condition and the land itself badly scored and gullied by lumbering operations), and, obviously, was not readily salable at a figure in excess of $1,000 — nor would the interest on $1,700 be sufficient to support him. The main test is what remains after the transfer.Pearce v. Stines, supra (at p. 55); Hunt v. Naylor,84 N.J. Eq. 646 (at p. 651).
That the transfer was improvident, then, seems clear, in view of the failure to establish the alleged consideration. *Page 325 
That the transferor received any competent, independent advice is not, and cannot be, contended, for there is not even a hint to that effect in the evidence.
If the rule as to independent advice still applies to transfers which are improvident, notwithstanding a verbal promise of support for life, then it would seem that this case would not avoid the operation of the rule even if it were deemed that the making of the verbal promise by the son, as consideration had been established. The father, in that aspect of affairs, would have exchanged a sum which, with the other assets, would have sufficed to support him, for a mere verbal promise of support and care, which, as heretofore indicated, he might not be able to enforce or rescind. Such a bargain seems improvident in only little less degree than a mere gift.
It must be concluded, therefore, that equity requires the setting aside of the transfer. On the other hand, the case calls for the application of the rule in Reeves v. White, supra, requiring that the exceptants seeking equitable relief should do equity by making adequate allowance in recompense for the services performed by the son. A fair allowance to the son for the board, lodging, care and services rendered by himself and his wife, before and after the transfer, would seem to be $1,000. The evidence is impossible of exact reduction into dollars and cents.
It appears that the testator had spent the winters with his son for some eight or ten years (he had also made a couple of visits with him, of about two weeks at a time, at other seasons of the year, but he had made like visits with the other beneficiaries); that he had paid nothing for board, lodging or washing; that he had required no care prior to last winter, except on one occasion, when he had hurt his arm; that during the last winter he had required extra care and attention; that he could have obtained board and lodging at $6 per week.
The decree of the orphans court will be sustained, with this modification: that the sum directed to be charged against the executor be reduced by the sum of one thousand dollars ($1,000). *Page 326 
The conclusion reached should not be understood as a determination that the appellant was, in fact, guilty of fraud or undue influence, or of taking an unfair advantage; the determination is that, under all the circumstances, the law cast upon him the burden of proving that he did not exert fraud or undue influence or take unfair advantage, and that the transferor thoroughly understood the transaction and had independent advice, and that this he has failed to prove. For this, if the transaction was, in fact, a fair and straightforward one, and thoroughly understood by the father, he had only himself to blame. It must have been obvious to him, as an ordinarily intelligent man, that a transfer under all the existing circumstances, with only a verbal promise in return, would have a suspicious appearance to his sister and the other exceptants, and it would have been a simple thing for him to have taken steps which would preclude the possibility of adverse inferences.
The respondents attack the provision of the decree below, directing that the costs of the litigation, including counsel fees of $500 to each side, be paid out of the estate. It must be confessed no reason is apparent for such a direction. If the litigation be considered as between the estate and the transferee, the decree, which directs the payment of some $4,000 by the transferee to the estate, nevertheless, awards the transferee his costs against the estate. If it be considered a suit by the exceptants against the transferee for the recovery of two-thirds of $4,000, which, as a practical matter, it was, the exceptants, although completely successful, are charged with one-third of the transferee's costs and counsel fees. No precedent is known for such an inconsistency, for there is nothing in the evidence to justify it. On the other hand, the evidence does show a situation which should properly have resulted in visitation of costs upon the transferee (under the power conferred by section 196 of the Orphans Court act), even if he had been successful in the litigation for his inexplicable conduct (in refusing to give the exceptants any of the information or explanation to which they were entitled, until after they had retained counsel, and not *Page 327 
even then any explanation other than the bare statement that the transfer had been made for services rendered), practically compelled the litigation.
The respondents, however, filed neither notice of appeal in the orphans court, nor petition of appeal in this court. They did set up objection to the order as to costs in their answers to the petition on appeal. Possibly such answers might be amended so as to constitute cross-petitions of appeal as well as answers, but that would not cure the failure to file notice of appeal in the orphans court. The filing of such notice within the time limited by statute therefor is a requisite to the right of appeal.Claypool v. Norcross, 37 N.J. Eq. 261. The statutory time has long since elapsed.
Of course, it is well settled that questions as to the jurisdiction of the lower court may be raised in the appellate court, though not raised in the court below, and may be raised by the appellate court itself, though not raised by the parties. It seems clear that the orphans court had no jurisdiction to direct the payment of these costs and fees out of the estate. Its power in that behalf is conferred by statute. Orphans Court act, section 197. Under that section it may allow counsel fees as part of the costs and expenses of litigation (Bioren v. Nesler,76 N.J. Eq. 576), but its power to direct payment out of the estate is limited to probate contests. See the statute, and In reMeyers' Estate, 71 N.J. Eq. 724. The instant case was not a probate contest.
But has this court, in the instant case, jurisdiction as to that portion of the orphans court decree dealing with the costs and fees, so as to be able either to affirm, reverse or modify? The notice of appeal filed by appellants in the orphans court appeals from the decree "and every part thereof." The petition of appeal filed in this court appeals only from that part of the decree which sustains the exceptions to the account and directs the executor to add to the inventory, and to account for the $4,200 in question; it does not appeal from that part of the decree relating to costs and fees. *Page 328 
It would seem obvious that there must be some proceeding in this court to give this court jurisdiction of the cause, and that this must be the petition of appeal; also, that the "cause" before this court, the subject-matter of the appellate jurisdiction, is determined by the petition of appeal, analogous to the original pleading in a court of original jurisdiction; hence, that this court would not have jurisdiction to review an order or decree not appealed from in the petition of appeal, nor a distinct and separable portion, not appealed from in the petition, of a decree whereof another distinct and separable apportion was appealed from.
It is not perceived, therefore, under the circumstances of the case sub judice, that any order, whether of affirmance, reversal or modification, may validly be made relative to the portion of the decree below dealing with costs and fees. The situation may, however, be taken into consideration on an application as to costs and counsel fees in this court, if such be made.